AVAILABLE IRON AND METAL COMPANY, Plaintiff-Appellee, *v.* FIRST NATIONAL BANK OF BLUE ISLAND, Defendant-Appellant.

First District (5th Division)   No. 76-789

Opinion filed December 23, 1977.

Andrew R. Laidlaw and James F. Best, both of Seyfarth, Shaw, Fairweather & Geraldson, of Chicago, for appellant.

William L. Smith, Jr., of Hollobow & Taslitz, of Chicago, for appellee.

Mr. JUSTICE WILSON delivered the opinion of the court:

This is an appeal from a judgment finding defendant, First National Bank of Blue Island (hereinafter "Bank"), liable for the amount of three checks which plaintiff, Available Iron and Metal Company (hereinafter "Available"), presented for collection. The only issue raised on appeal is whether the Bank breached the duty imposed upon it by section 4—302 of the Uniform Commercial Code (hereinafter "Code") (Ill. Rev. Stat. 1975, ch. 26, par. 4—302), to either pay, return, or send notice of dishonor of these checks in a timely manner. We affirm.

Available collected scrap metal from various industries and delivered it to scrap yards. Reuben R. Graff Company (hereinafter "Graff Co.") operated a scrap yard which processed such scrap metal and sold it to mills. For 10 or 12 years prior to 1972 Graff Co. provided Available with a rent free office at its yard and serviced some of Available's customers by picking up their scrap in its trucks and transporting the scrap to its yard. During this period Graff Co. paid Available by check on a weekly basis for both the scrap its trucks brought in from Available's customers and and the scrap Available's trucks delivered to its yard. At times one of Graff Co.'s employees, Jane Duhick, requested that Available wait awhile before cashing these checks. Both companies were customers of the Bank in 1972.

On several occasions prior to 1972 Graff Co. had borrowed money from the Bank. By early 1972 the company owed the Bank approximately $500,000. Most of this debt was secured by Graff Co.'s inventory, accounts receivable, fixed assets and land under the provisions of several security agreements signed by Reuben R. Graff, Graff Co.'s president, on behalf of the company. The remainder was secured by stocks and a certificate of deposit owned by Mrs. Reuben R. Graff. The security agreements gave the Bank the right to apply all proceeds from inventory sales and all collections on accounts receivable to the reduction of the secured indebtedness upon default.

In late March of 1972 discrepancies between Graff Co. accounts receivable schedules held by the Bank and Graff Co.'s books were discovered. Audits disclosed that the company's accounts receivable were significantly overstated in the schedules. Because the overstatement meant Graff Co. had less in the way of assets to secure its loans than the Bank thought was available, the Bank became concerned about its loans and sent its senior vice president and controller, Fred W. Mansfield, to Graff Co.'s yard for the purposes of watching assets, converting inventory into cash and generally protecting the Bank's interest. Mansfield arrived in late March of 1972 and remained at the yard until late April or early May of 1972. While he was there, Mansfield picked up the mail each day, watched as it was opened by a Graff Co. employee and reviewed the

checks that were received. He also reviewed the company's books and took physical control of Graff Co.'s unused checks. He kept these checks locked up and he had the only key to the lock. Consequently, the company could not issue a check without his permission. He frequently reported to the Bank about the amounts of money Graff Co. received and about the company's operations.

In late March of 1972 one of the owners of Available, Harold Silvers, noticed that Mansfield was at the Graff Co. yard every day and asked him why he was there and what he was doing. The controller responded that the company had problems and that he was there to straighten some things out. Later that month Harold Silvers and the other owner of Available, Arnold Silvers, met with Reuben R. Graff. During this meeting the president of Graff Co. told them he was in trouble but he also told them not to worry as he had enough inventory at the yard to straighten things out. Then on either April 3, 4, or 5, the two Silvers met with Mansfield in Available's office. The Silvers were concerned about the money, approximately $70,000 at this point, that Graff Co. owed them and asked Mansfield how bad things were. Mansfield was evasive and told them only that Graff Co. had little problems which the Bank was trying to straighten out. The controller suggested that they should "sit tight" and told them not to "rock the boat."

Graff Co. gave Available the three checks in issue on or about the date they were dated. One of these checks was dated March 17, 1972, and was in the amount of $8,556.50. The second check was dated March 24, 1972, and was for $9,139.15. The third check was dated April 5, 1972, and was for $9,399.15. On April 6, 1972, Harold Silvers took the third check to the Bank. He went to a teller and submitted the check for deposit. Instead of accepting it the teller told him to take it to Boyd A. Wagener, a vice president of the Bank. He went over to Wagener's desk and asked Wagener how he could get the check taken care of. Wagener said: "We'll put it in for collection now and we'll see that you get your money just as soon as there is money in the bank." Then Wagener took the check to another Bank employee and told her to put it in for collection and make out a receipt. While Silvers was sitting at her desk waiting for the receipt, Rueben R. Graff walked up. Silvers told Graff he was there to put some money in the Bank. Graff said: "Oh, I'm making a big deposit now. There should be plenty of money to cover that check." Then the employee gave Silvers a receipt for the check.

On or about April 13, 1972, the Silvers met with a number of Bank officials at the Bank, including Hugh M. Driscoll, the president of the Bank, Vincent C. Yager, the executive vice president, Mansfield and Wagener. At this meeting the Silvers expressed concern about getting paid by Graff Co. and they were told that Graff Co. was on the verge of

bankruptcy, that the Bank was a secured creditor and that the Bank's interests were going to come first.

On April 17, 1972, Harold Silvers took the March 17 and March 24 checks to the Bank and apparently went directly to Wagener's desk upon entering the Bank. He asked Wagener if he should put these checks in for collection and Wagener responded in the affirmative. Then Silvers went through basically the same procedure as he did with the April 5 check. He had not taken these checks to the Bank earlier because of a request made by Jane Duhick to hold them.

On April 25, 1972, Harold Silvers received the April 5 check and a notice indicating that it was returned unpaid because of insufficient funds. On April 27, 1972, he received the other two checks and two notices indicating that they were also returned because of insufficient funds.

On or about May 1, 1972, Graff Co. went bankrupt. When it went into bankruptcy Graff Co. owed Available approximately $74,000. Available received approximately $11,100 of this amount. The Bank, on the other hand, did not lose any money.

Opinion

I

The court below found that the Bank had violated section 4—302 of the Code (Ill. Rev. Stat. 1975, ch. 26, par. 4—302). The Bank argues that it gave Available timely notice of dishonor and that it "returned" the checks in question before the midnight deadline set forth by section 4—302, thus it did not violate section 4—302.

Section 4—302 provides in pertinent part:

> "In the absence of a valid defense * * *, if an item is presented on and received by a payor bank the bank is accountable for the amount of
>> (a) a demand item * * * whether properly payable or not if the bank * * * does not pay or return the item or send notice of dishonor until after its midnight deadline * * *."

Section 4—104(1)(h) of the Code (Ill. Rev. Stat. 1975, ch. 26, par. 4—104(1)(h)) defines "midnight deadline" as midnight of the banking day following the banking day on which the item is received.

A

In connection with the "returned" leg of its argument, the Bank accurately points out that section 4—301(4)(b) of the Code (Ill. Rev. Stat. 1975, ch. 26, par. 4—301(4)(b) provides that an item is "returned" when it is delivered to the bank's customer, and correctly adds that this provision is controlling in the instant case. Then the Bank asserts that the following testimony of Harold Silvers establishes that he gave the teller the three

checks in question and she gave them back to him and thereby "returned" them to him:

"Q. You went to the teller, is that correct?

A. That's correct.

Q. Did you submit the check for payment or deposit?

A. Yes, I did.

Q. And, was it refused?

A. It was—Yes, it was refused and I took it to Boyd Wagner [*sic*]."

One of the problems with this assertion is that it ignores the context in which the quoted testimony was given. The testimony immediately prior to this testimony refers only to the April 5 check, and nothing within the quoted testimony stretches its import beyond that check. Indeed, there is nothing in the record before us which indicates that Harold Silvers took the March 17 and March 24 checks to the teller before taking them to Wagener. Thus neither this testimony nor any other testimony in the record before us establishes that the teller "returned" the latter checks to Silvers.

Another problem with this assertion is connected with a necessary condition for operation of section 4—302, namely, that the payor bank receive the item. While the teller must have looked at the check before refusing to pay or deposit it, the quoted testimony does not establish that the teller in any way "received" the April 5 check. In other words, this testimony establishes the facts that Silvers presented, tendered, offered, extended or held out the check for either payment or deposit and that the teller did not accept it for either payment or deposit, but does not establish that the teller even temporarily took physical control of the check. Nor is there any other evidence in the record which shows that the teller even had physical control of the April 5 check. The significance of the teller refusing to accept the check for payment or deposit and of no evidence establishing that she ever had physical control of this check is that: (1) the Bank had not received the check, and hence was not liable for it under section 4—302, when Silvers left the teller's window; and (2) it cannot logically be said that the teller gave the check back, or "delivered" the check, to Silvers if she never "received" it in the first place. Of course, the significance of being unable to say that the teller "delivered" the April 5 check to Silvers is our inability to find that the teller "returned" the April 5 check to Silvers.

Furthermore, when we add other testimony before us to the quoted testimony, even if (1) the teller touched the April 5 check or took it from Silvers and held it in her hand, and thereby "received" it in the sense of acquiring possession of it, and (2) the teller thereafter gave the check back to Silvers and thereby "delivered" it to him in the sense of handing it

over or transferring possession, we are not at all sure that the transfers of possession from Silvers to the teller and from the teller back to Silvers constitute a section 4—302 receipt and return. The only evidence before us concerning the teller's actions and statements is Silvers' testimony. The Bank has pointed to a portion of this testimony but ignored additional pertinent passages. The testimony we refer to immediately follows the quoted testimony and is:

"Q. So, the teller said that there were insufficient funds to pay the check?

A. No, she said take it to Mr.—She didn't say that, she said to me, 'Take it to Mr. Wagner [sic].'

Q. She said take it to Mr. Wagner [sic]?

A. Yes, she told me to take it to Mr. Wagner [sic].

Q. Or, did you take it to Mr. Wagner [sic] on your own volition?

A. No, I didn't.

Q. Well, in any event, the check was refused and dishonored at that time, is that right?

A. I don't know about being dishonored."

Upon combining this testimony and the previously quoted testimony we find that the only statement made by the teller to Silvers was a direction to take the check to Wagener. Even if we assume the teller took the check and then handed it back to Silvers, from these actions and the teller's statement it could be inferred that the teller simply postponed the receipt of the check and that it was not "received" by the Bank until the next Bank employee took it from the payee. Of course, if the teller simply caused a delay in the Bank's receipt of the check, and her actions and direction consequently did not trigger the operation of section 4—302, the teller could not satisfy the section 4—302 requirement of a seasonable "return" of the item *after its receipt by the payor bank* by handing the check back to Silvers.

### B

In connection with the timely notice of dishonor leg of its argument, the Bank asserts that the testimony it points to also establishes that Silvers received oral notice of dishonor of the three checks.

■■ There are numerous problems with this assertion. The first involves section 3—508(3) of the Code (Ill. Rev. Stat. 1975, ch. 26, par. 3—508(3)), which provides:

"Notice may be given in any reasonable manner. It may be oral or written and in any terms which identify the instrument and state that it has been dishonored. A misdescription which does not mislead the party notified does not vitiate the notice. Sending the instrument bearing a stamp, ticket or writing stating that

acceptance or payment has been refused or sending a notice of debit with respect to the instrument is sufficient."

Section 4—104(3) of the Code (Ill. Rev. Stat. 1975, ch. 26, par. 4—104(3)) makes section 3—508 applicable to article 4 of the Code (Ill. Rev. Stat. 1975, ch. 26, pars. 4—101 through 4—504). On the basis of these provisions the Bank assumes in its assertion that oral notice of dishonor is sufficient notice of dishonor to establish compliance with section 4—302(a). This assumption conveniently ignores the pertinent language of section 4—302(a), which is: "send notice of dishonor." Section 1—201(38) of the Code (Ill. Rev. Stat. 1975, ch. 26, par. 1—201(38)) defines "send" as follows:

" 'Send' in connection with any writing or notice means to deposit in the mail or deliver for transmission by any other usual means of communication with postage or cost of transmission provided for and properly addressed and in the case of an instrument to an address specified thereon or otherwise agreed, or if there be none to any address reasonable under the circumstances. The receipt of any writing or notice within the time at which it would have arrived if properly sent has the effect of a proper sending."

Section 4—104(4) of the Code (Ill. Rev. Stat. 1975, ch. 26, par. 4—104(4)) makes this definition applicable in the provisions of article 4 of the Code. When we insert this definition in section 4—302(a), we are led to the conclusion that oral notice of dishonor is not sufficient notice of dishonor to establish compliance with section 4—302(a). (*Cf. In re United States v. Loskocinski* (E.D. N.Y. 1975), 403 F. Supp. 75.) Moreover, section 4—102(1) of the Code (Ill. Rev. Stat. 1975, ch. 26, par. 4—102(1)) provides that when there is a conflict between a provision of article 4 and a provision of article 3 of the Code (Ill. Rev. Stat. 1975, ch. 26, pars. 3—101 through 3—805), the article 4 provision governs. It could be argued that there is a conflict between section 3—508(3) and section 4—302(a) because under the former section an oral notice of dishonor could be found to be sufficient notice of dishonor to establish compliance with section 4—302(a)'s "send notice of dishonor" requirement, while under the latter, oral notice would not be sufficient. Even if this argument was made, in light of section 4—102(1), we would hold that oral notice of dishonor is not sufficient notice of dishonor under section 4—302(a), and that only written notice of dishonor is sufficient to establish compliance with that section of the Code. See *Valley Bank & Trust Co. v. First Security Bank* (Utah 1975), 538 P.2d 298.

Even if we were to find oral notice of dishonor satisfactory, however, other problems with the Bank's assertion that Silvers received oral notice of dishonor of the three checks would cause us to find it unpersuasive.

Under section 4—302, after a check is presented on and received by a payor bank which is also the depositary bank, the bank is accountable for the amount of a check only if it does not pay it, return it, or send notice of dishonor with regard to it, by the midnight deadline, and only if it cannot establish a valid defense, such as a settlement. As we have indicated, there is nothing in the record before us which indicates that Harold Silvers took the March 17 and March 24 checks to the teller before he presented them to Wagener. Consequently we could not find either that the teller "received" these checks, or that she gave oral notice of dishonor with regard to them. Additionally, as we have already noted, the record before us does not support the finding that the teller in any way "received" the April 5 check. Thus we could not find that she gave an oral notice of dishonor of this check which satisfied section 4—302, that is, an oral notice of dishonor given after receipt, even if we decided in the abstract that oral notice of dishonor could satisfy section 4—302.

■■ ■ Furthermore, even under section 3—508(3), an oral notice of dishonor must be given in a reasonable manner and in some terms which state that the instrument has been dishonored. Even if we found that oral notice of dishonor could satisfy section 4—302, and even if we found that the teller did "receive" the April 5 check and then hand it back to Silvers, her statement to Silvers after she received it and her action of handing the check back to him would not constitute an oral notice of dishonor given in a reasonable manner. The teller did not tell Silvers that there were insufficient funds to pay the check. While the teller "refused" the check, it appears that this refusal was implicit in her direction to take the check to Wagener and in her action of handing the check back to Silvers (assuming she did so). A direction to take a check to another bank employee and the action of handing the check back to the payee, without more, cannot reasonably be said to constitute a statement that the check has been dishonored. Indeed, the evidence before us supports not only the finding that the teller did not give notice of dishonor in a reasonable manner, but also a finding that the teller's statement and action simply deferred or postponed the Bank's acceptance of the April 5 check. Hence, it could arguably be concluded that (1) the teller did not actually refuse to accept it and (2) she did not dishonor the check.

## C

■■ Also in connection with the timely notice of dishonor leg of its argument, the Bank asserts that the collection receipts Silvers received for the three checks constituted written notices of dishonor of the three checks. In our view the collection receipts Silvers received were merely the Bank's written acknowledgements of its receipt or acceptance of the checks for collection. Furthermore, section 3—508(3) appears to require

that a written notice of dishonor must bear some terms which state the dishonor. These collection receipts bear no terms expressing dishonor or any other indication that the checks were dishonored. Consequently we certainly could not find that the collection receipts Silvers received gave him notice of dishonor in a reasonable manner.

## II

In the alternative, the Bank argues that an agreement between the parties freed or released the Bank from its section 4—302(a) obligation to Available.

Section 4—103(1) of the Code (Ill. Rev. Stat. 1975, ch. 26, par. 4—103(1)) provides in pertinent part:

> "The effect of the provisions of this Article may be varied by agreement except that no agreement can disclaim a bank's responsibility for its own lack of good faith or failure to exercise ordinary care * * *."

Obviously an agreement which varies the *effect* of a provision is different from an agreement which varies the *terms* of a provision. Admittedly, sometimes, perhaps often, the result of varying the *terms* of a provision will be a variation in the *effect* of the provision. However, this is not always the case. We also note that since the language of section 4—103(1) is clear and unambiguous, we have no occasion to engage in statutory construction. (See *Nordine v. Illinois Power Co.* (1965), 32 Ill. 2d 421, at 428, 206 N.E.2d 709; *People ex rel. Nelson v. Olympic Hotel Building Corp.* (1950), 405 Ill. 440, 444, 91 N.E.2d 597; *Shanahan v. Policemen's Annuity & Benefit Fund* (1976), 43 Ill. App. 3d 543, 546-47, 357 N.E.2d 582.) Hence we would not be justified in construing "effect" in the quoted passage to include "terms." The importance of these observations is as follows. Under the facts of the case at bar, the pertinent effect of section 4—302 is that the Bank is liable for the checks in question if it did not either return them, or send notice of dishonor with regard to them, by the midnight deadline, and if it cannot establish a valid defense. In this argument the Bank assumes *arguendo* that it did not return or send notice of dishonor of these checks by the midnight deadline. Thus, in the context of this argument, the pertinent effect of section 4—302 is that the Bank is liable for the checks if it cannot establish a valid defense. By way of a valid defense, the Bank advances this argument that an agreement between the parties excused the Bank from its obligation to either return, or send notice of dishonor of the checks in question by the midnight deadline. In our view, section 4—103(1) makes any agreement which negates or nullifies the *effect* of section 4—302 (here, the Bank's liability for the checks), a valid defense. In other words, under the facts of the case at bar an agreement which provided in effect that if the Bank did not

return or send notice of dishonor of the checks by the midnight deadline, then it would not be liable for them even though it violated its section 4—302 obligation, would be a valid defense. However, section 4—103(1) does not expressly permit an agreement to vary the *terms* of the provisions of article 4. In our view, any agreement releasing the Bank from its section 4—302(a) obligation to return or send notice of dishonor would be an agreement which varied the terms of section 4—302(a). Since such an agreement is not expressly permissible under section 4—103(1), it could be argued that such an agreement would not constitute a valid defense to liability under section 4—302(a). Consequently, it could arguably be found that even if the agreement advanced by the Bank exists, it is not a valid defense. However, we choose instead to assume, *arguendo*, that such an agreement can be a valid defense and deal with the Bank's argument.

The Bank points out that section 1—201(3) of the Code (Ill. Rev. Stat. 1975, ch. 26, par. 1—201(3)) defines "agreement" as "the bargain of the parties in fact as found in their language or by implication from other circumstances including course of dealing * * *." Section 4—104(4) makes this definition applicable throughout article 4.

In support of its "agreement which released it from its obligation" argument, the Bank asserts that there was an understanding between the parties which constituted an implied agreement to excuse the Bank from its obligation. This understanding was that the checks in question would be accepted for collection on the condition that they would be held until the Graff Co. account had sufficient funds to cover them. According to the Bank a necessary implication of this understanding was that the length of time the checks would be held would be determined by Graff Co.'s account and not section 4—302. The "other circumstances" which allegedly gave rise to this implied agreement were: (1) the circumstances surrounding the presentation of the checks; (2) the discussion at the Bank on or about April 13, 1972; and (3) a course of dealing.

The circumstances surrounding the presentation of the checks were that on April 6, 1972, Harold Silvers took the April 5 check to Wagener and asked him how he (Silvers) could get the check taken care of. According to Silvers, Wagener said: "We'll put it in for collection now and we'll see that you get your money just as soon as there is money in the bank." While waiting for his receipt, Reuben R. Graff came up and told Silvers he was at the Bank for the purpose of making a deposit and that there should be "plenty of money" to cover the check. On April 17, 1972, Silvers took the other checks to Wagener and asked if these checks should be put in for collection. Wagener responded affirmatively and told him these checks would be handled in the same manner as the first one. In addition, Vincent C. Yager, the executive vice president of the Bank,

testified that the Bank's auditor discovered in March of 1972 that all collections on Graff Co. receivables had not been reported to the Bank. Thereupon the Bank sent Mansfield to Graff Co. and, through him, took over financial management of Graff Co. The Bank's purpose in doing so was to protect its secured interest by liquidating Graff Co.'s inventory and seeing that all receivable collections reached the Bank. Yager further testified that during this period the Bank took all of Graff Co.'s collections on receivables and applied them to the outstanding debt. At the same time the Bank made working capital loans to Graff Co. so that it could continue to function while the Bank attempted to liquidate inventory. Over this period all of Graff Co.'s working capital came from these new loans from the Bank.

Moreover, while Mansfield was at Graff Co.'s yard, he was informed of the company's checking account balance each day by telephone, he kept the company's check book locked up and Graff Co. could not issue a check without his permission. In late March of 1972 he told Harold Silvers that the company had problems and he was at the scrap yard to straighten some things out. Later that month the owners of Available were reassured by Reuben R. Graff. Then in early April Mansfield told them that Graff Co. had little problems which the Bank was trying to straighten out and added that they should "sit tight" and not "rock the boat." Subsequently Silvers took the checks in question to the Bank. Additionally, Mansfield testified that the Bank gave Graff Co. 13 loans between April 7, 1972, and April 29, 1972, for the general purpose of keeping Graff Co. in business and for the specific purposes of permitting the company to meet payrolls, pay current expenses and pay off old loans. On April 14, 1972, the balance in Graff Co.'s checking account was $15,187.40. On April 22, 1972, the balance in the company's checking account was $10,199.70. These balances were the end-of-day balances and were arrived at after all transactions on those days had been posted. The three checks in question were written on this Graff Co. account. Mansfield further testified that one of the checks in question was being held by the Bank for collection on April 14 and all three checks in question were being held for collection on April 22. Nevertheless one of these checks was returned to Available on April 25 and the other two were returned on April 27. Mansfield was in accord with the decision to return them for insufficient funds even though on both April 14 and April 22 there were sufficient funds in Graff Co.'s account to cover at least one of the checks. Mansfield added that there were sufficient funds in the checking account on Friday, April 14, to cover the April 5 check because a loan made to cover a payroll was erroneously left in the checking account and not transferred to Graff Co.'s payroll account. On Saturday, April 22, there were sufficient funds because another bank employee made a similar error. Thus one of the checks

could have been honored on these dates only out of funds intended for the payroll account and these funds existed only because of two loans made for the purpose of meeting Graff Co.'s weekly payroll.

In connection with the discussion at the Bank on or about April 13, 1972, Harold Silvers testified that he and his brother were told that Graff Co. was on the verge of bankruptcy, that the Bank was a secured creditor and that the Bank's interests were going to come first. However, Harold Silvers also testified that during this meeting either Mansfield or Yager said Available would receive 80 percent of the amount of its invoices on all shipments subsequently delivered to Graff Co.'s yard and Driscoll concurred. Because the Silvers had done business with the Bank for many years, they thought the Bank would honor this promise and they thereafter continued to ship scrap to Graff Co.'s yard in reliance on the promise. Arnold Silvers testified that concern was expressed at this meeting about getting paid by Graff Co. for past shipments. The Bank officials told him that Available was in a position to help Graff Co. get back on its feet and Available would collect 80 percent of the price of scrap delivered to Graff Co.'s yard in the future. Mansfield testified that he did not recall any discussion about 80 percent payments at the meeting but subsequently, while at Graff Co.'s yard, he noticed that Available continued to make deliveries. Yager testified that there was no conversation during the meeting about a promise to pay Available 80 percent on future shipments. Driscoll testified that there was no discussion at the meeting about the Bank promising to pay for 80 percent of the scrap Available delivered to Graff Co. after that date.

The course of dealing which the Bank points to is the receipt of deposit slips in the past when checks were presented for deposit.

In our view, taking over financial management of its customer Graff Co. put the Bank in a unique position in a relation to its other customer, Available. In the context of this unique position, Mansfield made misleading statements to the Silvers and instructed them to "sit tight" and not "rock the boat." On two occasions there were sufficient funds in Graff Co.'s checking account to honor one of the checks in question. The explanation for the presence of these funds in the checking account was that mistakes by Bank employees caused funds earmarked for Graff Co.'s payroll account to be left in the checking account. The Silvers learned that Graff Co. was on the verge of bankruptcy at the April 13 meeting but they testified that they were promised 80 percent of the amount of invoices on all future shipments at that meeting and, in reliance on this promise, they continued to ship scrap to Graff Co. Mansfield could not recall this promise being made, Yager said there was no such promise and Driscoll said no such promise was made at the meeting. Obviously there is a disagreement between the parties as to whether this promise was made.

The trial judge, sitting as the finder of fact in the bench trial below, could have chose to believe the Silvers. Furthermore, since the Silvers were told at the April 13 meeting that Graff Co. was on the verge of bankruptcy, it seems doubtful to us that Available would have made subsequent deliveries if the Silvers had not been given some assurance as to payment for future deliveries at that meeting. The Bank maintains that the court below ruled that this 80 percent promise was not enforceable and not relevant to any issue presented. There is no such ruling in the record before us, but even if there was and even if the promise was not enforceable, we would not agree that it was not relevant. In our opinion it is very relevant to whether the Bank acted in good faith.

In short, the circumstances which allegedly give rise to the "agreement" also support the findings that: (1) prior to April 13 the Bank, through Mansfield, misled Available's owners as to Graff Co.'s financial condition; (2) the Bank made loans to Graff Co. for the purpose of paying current expenses but did not honor any of the checks in question despite the fact that there were funds that could have been used to honor at least one of the checks; (3) the Bank made repeated mistakes in its financial management of Graff Co. and used these mistakes and an alleged "payroll purpose" for certain funds to justify not honoring one of the checks in question; and (4) the Bank promised Available's owners that they would receive at least 80 percent of the invoice price of scrap deliveries made after the April 13 meeting. In addition, Mansfield was at Graff Co.'s yard protecting the Bank's interest and seeing that all collections on receivables went to the Bank where they were applied to outstanding loans. He knew additional deliveries were being made after April 13, and he reported to the Bank on a regular basis.

Section 4—103(1) provides that no agreement can disclaim a bank's responsibility for its own lack of good faith or failure to exercise ordinary care. We believe the unique position of the Bank in relation to Available entailed a duty of acting in good faith in dealings with Available which was more extensive than the good faith burden which banks normally bear. However, we believe the foregoing circumstances amount to action in bad faith in dealings with Available and its owners under not only this more extensive duty, but also under the normal good faith burden of "honesty in fact" imposed by sections 1—201(19), 1—203 and 4—104(4)). For example, while the "honesty in fact" burden *may* not have required Mansfield to disclose information about Graff Co.'s financial condition to the Silvers, that is, to answer or respond to the Silvers' questions in any manner whatsoever, at the very least this burden required him to tell the truth about the seriousness of Graff Co.'s condition upon answering. In our view, Mansfield's misleading answers are one instance of bad faith under the "honesty in fact" burden of good faith.

The Bank argues that the checks were accepted for collection on the condition that they would be held until the Graff Co. account had sufficient funds to cover them. On two occasions the account had sufficient funds to honor at least one of the checks in question and the Bank did not honor one of the checks. We fail to see how this failure could be considered honesty in fact in the conduct or transaction of holding the checks for collection. Even if we accept at face value the Bank's "mistakes and earmarkings" explanation of why the funds were in the Graff Co. checking account, we fail to see how this negligence raises the failure to live up to the "condition" to the level of honesty in fact.

■■ Also, we fail to see how the failure to live up to the 80 percent promise could be considered being honest in fact. We believe any reasonable businessman would expect to receive 80 percent payment on checks subsequently placed for collection upon receipt of such a promise and under such circumstances. Hence we again find that the Bank misled the Silvers. Indeed, in our opinion the entire record before us supports the finding that the Bank, having intimate knowledge of Graff Co.'s financial condition, took unfair advantage of Available and its owners and acted in bad faith in its dealings with them. Consequently, even if there was an agreement which released the Bank from its obligation to either return or send notice of dishonor (and assuming, *arguendo,* that such an agreement would be a valid defense to liability under section 4—302(a)), we would hold that it was ineffective. *Cf. Sun River Cattle Co. v. Miners Bank* (1974), 164 Mont. 237, 521 P.2d 679.

### III

Again in the alternative, the Bank argues that its obligation under section 4—302 was excused because (1) section 3—511(2)(b) of the Code (Ill. Rev. Stat. 1975, ch. 26, par. 3—511(2)(b)) provides that notice of dishonor may be entirely excused when a party has no reason to expect that an instrument will be honored, (2) section 3—511(2)(b) is applicable to the obligation imposed by section 4—302 and (3) the Silvers had no reasonable expectation of receiving any payment. Even if we assume, *arguendo,* that, in the abstract, under section 3—511(2)(b)'s "no reason to expect" passage, a showing of no reason to expect payment would excuse the section 4—302 obligation of giving notice of dishonor and be a valid defense to section 4—302 liability arising out of a failure to send a timely notice of dishonor, the Bank's argument fails to explain why there is no obligation under section 4—302 to "return" the checks in question in a timely manner. The Bank's obligation under section 4—302 was to either pay the checks, return them or send notice of dishonor. It had to do one of these three things in a timely manner. The checks were not paid and we assume in this argument that sending notice of dishonor was excused.

However, we fail to see how a release from one alternative releases the Bank from the remaining alternative. A release from one alternative method of satisfying a duty does not logically constitute a release from another alternative method of satisfying the duty, and it seems to us that the duty continues to exist until all alternatives are excused, or, at least, some reasonable explanation is offered for failure to satisfy the duty through the other alternatives.

A second problem with the Bank's argument is the assumption that section 3—511(2)(b) applies to Available. Section 3—511 (Ill. Rev. Stat. 1975, ch. 26, par. 3—511) provides in pertinent part:

"(2) * * * notice * * * is entirely excused when

(a) the party to be charged has waived it * * * or

(b) such party has himself dishonored the instrument or has countermanded payment or otherwise has no reason to expect or right to require that the instrument be accepted or paid * * *."

"Such party" in section 3—511(2)(b) refers to "the party to be charged" in section 3—511(2)(a). Commonly "the party to be charged" is an indorser who can be held liable for the instrument in an action by the payee only if he has received timely notice of dishonor. (See, *e.g., Hane v. Exten* (1969), 255 Md. 668, 259 A.2d 290.) Here the Bank would have us treat the plaintiff-appellee Available, who is the payee on the three "on us" instruments in question, as "the party to be charged" or the party to be held liable, even though the defendant and party against whom liability is asserted is the Bank. Assuming, *arguendo,* that section 3—511 is applicable in article 4, we have serious doubts as to whether it would be proper for us to treat Available as "the party to be charged", and consequently as to whether section 3—511(2)(b) applies to Available, under the facts and circumstances of the case at bar.

■■ Furthermore, section 3—511(2)(b) speaks of *no reason to expect payment* and the Bank argues that the Silvers had *no reasonable expectation of receiving payment.* We believe there was both some reason to expect payment and a reasonable expectation of receiving payment. In late March of 1972 Mansfield told Harold Silvers that Graff Co. had problems and that he was at the yard to straighten some things out. Later that month Reuben R. Graff told the Silvers that he was in trouble but assured them that he had enough inventory at the yard to get things straightened out. Then on either April 3, 4, or 5, Mansfield told the Silvers that Graff Co. had little problems which the Bank was trying to straighten out. He also told them to "sit tight" and advised them not to "rock the boat." Harold Silvers testified that after this meeting he knew Graff Co. was in trouble but he did not know how bad the trouble was or how close Graff Co. was to going bankrupt. Harold Silvers took the April

5 check to the Bank on April 6. Instead of accepting the check the teller told him to take it to Wagener. Wagener told him that the check would be taken care of by putting it in for collection. While he was waiting for his receipt, Reuben R. Graff assured him that there would be sufficient funds to cover the check. Harold Silvers further testified that he had presented checks for deposit in the past and he had always received a regular deposit slip when he had done so. However, he did not know at this time what "put it in for collection" meant, and despite the fact that he received a "collection" receipt for this check, he thought it would be deposited right away because Graff was making a deposit and had told him there would be plenty of money to cover the check after the deposit was made. At the April 13 meeting the Silvers expressed concern about getting paid by Graff Co. for past shipments. Yager testified that at this meeting the Silvers requested that funds be advanced to pay the April 5 check. The Silvers were told that Graff Co. was on the verge of bankruptcy but that they were in a position to help Graff Co. get back on its feet and Available would receive 80 percent of the amount of its invoices on all shipments subsequently delivered to Graff Co. Because they had done business with the Bank for many years, the Silvers thought the Bank would honor this promise and they consequently relied upon it and continued to ship scrap to Graff Co. On April 17, the March 17 and March 24 checks were accepted for collection. Under these facts and circumstances we believe that both the Silvers and any reasonable businessman would have both a reason to expect receipt of full payment, and a reasonable expectation of receiving full payment, of the April 5 check prior to April 13. After April 13, we believe both the Silvers and any reasonable businessman would have both a reason to expect at least 80 percent payment, and a reasonable expectation of receiving at least 80 percent payment, of all three checks.

For the foregoing reasons we affirm the judgment of the Circuit Court of Cook County.

Affirmed.

SULLIVAN, P. J., and LORENZ, J., concur.