**WELLS FARGO BANK, National Association ·**

v.

**HARTFORD NATIONAL BANK AND TRUST COMPANY and Lincoln First Bank-Central, National Association.**

**Civ. No. H–75–217.**

United States District Court, D. Connecticut.

Feb. 11, 1980.

Albert Zakarian, Day, Berry & Howard, Thomas R. Wildman, Hartford, Conn., for plaintiff.

Robert A. Greenspon, Robinson, Robinson & Cole, Hartford, Conn., for defendant Hartford Nat. Bank & Trust Co.

J. Read Murphy, Susan S. Feltus, Murtha, Cullina, Richter & Pinney, Hartford, Conn., for defendant Lincoln First Bank.

### RULING ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

BLUMENFELD, Senior District Judge.

This is a suit commenced by Wells Fargo Bank, National Association ("Wells Fargo") to recover $25,000 from the Hartford National Bank and Trust Company ("HNBT"). Wells Fargo is seeking to reverse the credit it gave to HNBT in the course of handling a check which it had received for collection on which it was later unable to collect. HNBT, in turn, seeks indemnification from

the depositary bank, Lincoln First Bank–Central, National Association ("Lincoln"). Each of the parties have filed for summary judgment on the grounds that no material facts are in dispute, and each claim that Articles 3 and 4 of the U.C.C. entitle them to relief.[1]

Unlike many bank collection cases, this case does not involve the liability of the payor bank, First National Bank of Nevada ("Nevada"), which has not been sued, nor does it involve the liability of the now-bankrupt drawer of the check. The sole question presented by this action is which of these three banks in the chain of collection will have to absorb the loss occasioned by the "bad" check. This court has jurisdiction under 28 U.S.C. § 1332 and there is no dispute as to jurisdiction or venue.

## FACTS

The convoluted facts giving rise to this action are not in dispute, and summary judgment is therefore appropriate. However, before setting forth a detailed description of the intricacies of the bank collection process involved in this case, an overview of the transaction may be useful. On November 22, 1971, the check now in dispute was deposited with Lincoln. Since the check was drawn on the Nevada bank, Lincoln forwarded the check to Nevada via HNBT and Wells Fargo. On December 10, 1971, Nevada received the check and discovered that it was drawn on insufficient funds. Consequently, Nevada decided to dishonor the item and sent the check back to Lincoln via Wells Fargo and HNBT. Lincoln received notice of the dishonor in late December of 1971, but it had already allowed the depositor of the check to withdraw funds from his account making it impossible to charge back the amount of the dishonored item. Claiming that the notice of dishonor came too late, Lincoln refused to accept the return of the check and instead sent it back again to Nevada via HNBT and Wells Far-

go. When Wells Fargo received the item, however, it conditionally accepted responsibility for the loss and sought to collect from the drawer instead of delivering the check to Nevada. These efforts were unsuccessful and Wells Fargo, who now holds the dishonored item, commenced this action.

### A. From Lincoln to Nevada

On November 22, 1971, John D. Porter as agent for Great Western Industries, Inc. ("Great Western") opened a checking account with Lincoln by depositing a check for $25,000 payable to the order of Lincoln. The check was drawn on the Great Western account with the Reno branch of the Nevada bank. After it received the check and opened the account for Great Western, Lincoln forwarded the check on for collection.

Instead of utilizing the Federal Reserve Bank clearing house system, Lincoln chose instead to use private collection channels, which promised an earlier availability of funds. In this particular case, Lincoln indorsed the check and sent it to HNBT with the understanding that HNBT would promptly forward the check on for collection.

HNBT received the check on November 22, the same day on which it had initially been deposited. After crediting Lincoln's account for $25,000, HNBT indorsed the check and mailed it to its California correspondent bank, Wells Fargo. On November 23, Wells Fargo received and indorsed the check, credited HNBT's account, and then mailed the check to the Las Vegas branch of the Nevada bank.

During this last transfer a substantial delay was encountered. According to the Las Vegas branch bank records, the check inexplicably was not received in the mail until December 8, 1971, 15 days after Wells Fargo sent it. Moreover, an additional one day delay followed because the check was not drawn on the Las Vegas branch but rather on the Reno branch of the Nevada

1. The States of Nevada, California, Connecticut, and New York, in which the four banks are headquartered, all share identical statutes on the issues relevant to this case. Consequently, rather than consider conflict of laws questions, this opinion will merely refer to each statute by its generic Uniform Commercial Code citation.

bank. Since Las Vegas records did not reflect the extent of funds in Great Western's Reno account, it was necessary for the Las Vegas branch to forward the check to the Reno branch before the Nevada bank could establish whether there were sufficient funds to cover the check. When the check finally arrived at Reno, the Nevada bank promptly discovered that there were insufficient funds in Great Western's account.

## B. *From Nevada to Lincoln*

At 4:45 p.m. on December 10, 1971, Nevada bank personnel sought to inform Wells Fargo by telephone that the check had been dishonored. The call was made to a bank officer in Wells Fargo's San Francisco branch, but it was apparently "rejected" because it was not accompanied by sufficient identifying information. The Nevada bank made a second call, this time to Wells Fargo's Los Angeles Branch. At 5:30 p.m. this call was "accepted."

Since December 10, 1971 was a Friday, the next banking day was Monday, December 13, 1971. On Monday, the Nevada bank posted the dishonored check to Wells Fargo, which did not receive it until Friday, December 17. Nevada also reversed the credit which it had given to Wells Fargo.

Upon receiving the check, Wells Fargo immediately wired notice of the dishonor to HNBT. On the same day, Wells Fargo also returned the dishonored item by mail to HNBT and reversed the credit it had previously given. HNBT claims not to have

received the telegram on the 17th but admits that it received the check in the mail on Monday, December 21. On that same day, HNBT notified Lincoln by telegram that the check had been dishonored. This notice, however, did not indicate the name of the drawer of the check and therefore failed to give Lincoln effective notice. Lincoln's first opportunity accurately to identify the dishonored item came when it received the check on December 27, 1971. HNBT had mailed the check to Lincoln on December 21 and had at the same time reversed the credit it had given earlier.

## C. *From Lincoln to Nevada Again*

For the purpose of ruling on these motions it is not necessary to detail the remaining transfers of the check. Suffice it to say that on December 28, 1971, Lincoln declined to accept the check, claiming that the notice of dishonor had arrived too late. The item was sent back through the chain of collection and ultimately Wells Fargo ended up with both the check and the $25,000 loss. After several unsuccessful efforts at working out repayment from Great Western, Wells Fargo commenced this action.

Wells Fargo now moves for summary judgment against HNBT on three separate counts. It claims a right to proceed on HNBT's indorsement pursuant to U.C.C. § 3–414(1),[2] a right to proceed on HNBT's breach of an implied warranty pursuant to U.C.C. § 4–207(2),[3] and a right to "charge

---

**2.** U.C.C. § 3–414(1) provides:

"Unless the indorsement otherwise specifies (as by such words as 'without recourse') every indorser engages that *upon dishonor and any necessary notice of dishonor* and protest he will pay the instrument according *to its tenor at the time of his indorsement* to the holder or to any subsequent indorser who takes it up, even though the indorser who takes it up was not obligated to do so." (Emphasis added.)

**3.** U.C.C. § 4–207(2) provides:

"Each customer and collecting bank who transfers an item and receives a settlement or other consideration for it warrants to his transferee and to any subsequent collecting bank who takes the item in good faith that

(A) he has a good title to the item or is authorized to obtain payment or acceptance on behalf of one who has a good title and the transfer is otherwise rightful; and (b) all signatures are genuine or authorized; and (c) the item has not been materially altered; and (d) *no defense of any party is good against him;* and (e) he has no knowledge of any insolvency proceeding instituted with respect to the maker or acceptor or the drawer of an unaccepted item. In addition each customer and collecting bank so transferring an item and receiving a settlement or other consideration engages that *upon dishonor and any necessary notice of dishonor* and protest he will take up the item." (Emphasis added.)

back" to HNBT pursuant to U.C.C. § 4–212(1).[4] As a necessary prerequisite to recovery under any of these theories, Wells Fargo must first establish that it gave HNBT timely notice of Nevada's dishonor of the check.[5] If Wells Fargo, with all the disputed facts resolved in its favor, cannot establish that it gave a notice of dishonor when due, HNBT and Lincoln are entitled to prevail on their cross-motions for summary judgment. *Ambook Enterprises v. Time, Inc.,* 612 F.2d 604, 611 (2d Cir. 1979).

## THE LAW

U.C.C. § 3–508(2) provides that "[a]ny necessary notice must be given by a bank before its midnight deadline." "Midnight deadline," in turn, is defined as "midnight on [the bank's] next banking day following the banking day on which it receives the relevant item or notice . . . ." U.C.C. § 4–104(1)(h). Thus, in order to determine whether Wells Fargo gave HNBT a timely notice of Nevada's dishonor, it is first necessary to establish "the banking day on which [Wells Fargo received] the relevant item or notice . . . ."

4.  U.C.C. § 4–212(1) provides:
    "If a collecting bank has made provisional settlement with its customer for an item and itself fails by reason of dishonor, suspension of payments by a bank or otherwise to receive a settlement for the item which is or becomes final, the bank may revoke the settlement given by it, charge back the amount of any credit given for the item to its customer's account or obtain refund from its customer whether or not it is able to return the items *if by its midnight deadline or within a longer reasonable time after it learns the facts it returns the item or sends notification of the facts.* These rights to revoke, charge-back and obtain refund terminate if and when a settlement for the item received by the bank is or becomes final [as provided in] (subsection (3) of section 4–211 and subsections (2) and (3) of section 4–213)." (Emphasis added.)

5.  See emphasized portions of notes 2, 3 and 4 *supra.* In particular, nothing produced suggests that any extension of time beyond the midnight deadline would constitute a "longer reasonable time," as those words are used in U.C.C. § 4–212(1).

As indicated above, Wells Fargo received a notice of Nevada's dishonor by telephone on Friday afternoon, December 10, 1971. It sent no notice to HNBT before the midnight deadline on its next banking day, Monday, December 13. Wells Fargo first received written notice from Nevada on Friday, December 17, when the dishonored check arrived in the mail. Notice of dishonor was then sent to HNBT prior to midnight on Monday, December 21, the next banking day following receipt of the *written* notice. Therefore, the first question this court must decide is whether oral notice from the payor bank, Nevada, can trigger the obligation of the collecting bank, Wells Fargo, to give notice to its customer, HNBT.

At first reading, section 3–508(3) would seem to resolve this question. That section provides, "Notice may be given in any reasonable manner. It may be oral or written . . . ." By virtue of section 4–102(1),[6] section 3–508(3) applies to bank collections unless it conflicts with a specific provision of Article 4. In such a case, the Article 4 provision governs the transaction.

Wells Fargo argues that section 4–301[7] supersedes section 3–508 with respect to

6.  U.C.C. § 4–102(1) provides:
    "To the extent that items within this Article are also within the scope of Articles 3 and 8, they are subject to the provisions of those Articles. In the event of conflict the provisions of this Article govern those of Article 3 but the provisions of Article 8 govern those of this Article."

7.  U.C.C. § 4–301 provides in pertinent part:
    "(1) Where an authorized settlement for a demand item (other than a documentary draft) received by a payor bank otherwise than for immediate payment over the counter has been made before midnight of the banking day of receipt the payor bank may revoke the settlement and recover any payment if before it has made final payment [as provided in] (subsection (1) of Section 4–213) and before its midnight deadline it (a) returns the item; or (b) sends written notice of dishonor or nonpayment if the item is held for protest or is otherwise unavailable for return.
    "(2) If a demand item is received by a payor bank for credit on its books it may return such item or send notice of dishonor and may revoke any credit given or recover

notice from payor banks and that therefore only written notice from such banks triggers the presenting bank's obligation to pass the notice of dishonor down through the chain of collection.[8] This position appears to be meritorious and has been adopted by several courts.[9] This court, however, need not rule on the specific question.

Lincoln has raised an issue which dispenses with the need to determine whether oral or written notification is required by the terms of the statute itself. In an introductory section to Article 4, the U.C.C. provides:

"The effect of the provisions of this Article may be varied by agreement except that no agreement can disclaim a bank's responsibility for its own lack of good faith or failure to exercise ordinary care or can limit the measure of damages for such lack or failure; but the parties may by agreement determine the standards by which such responsibility is to be measured if such standards are not manifestly unreasonable.

"Federal Reserve regulations and operating letters, clearing house rules, and the like, have the effect of agreements under subsection (1), whether or not specifically assented to by all parties interested in items handled."

U.C.C. § 4–103(1), (2).

■ In its affidavits, Lincoln established that the transaction in question was governed by the terms of the Federal Reserve Operating Circular No. 6.[10] At the time of

---

the amount thereof withdrawn by its customer, if it acts within the time limit and in the manner specified in the preceding subsection.
"(3) Unless previous notice of dishonor has been sent an item is dishonored at the time when for purposes of dishonor it is returned or notice sent in accordance with this section."

8. U.C.C. § 4–301, which discusses notice of dishonor by payor banks, provides only for written notice. Moreover, the use of the word "sent" in section 4–301(3) further suggests that only written notice from a payor bank constitutes dishonor. See U.C.C. § 1–201(38). Since "an item is dishonored at the time . . . it is returned or notice sent in accordance with [§ 4–301]," Wells Fargo argues that only the written notice from Nevada triggered its obligation to give HNBT notice of dishonor.

9. Valley Bank & Trust Co. v. First Security Bank of Utah, N.A., 538 P.2d 298, 300 (Utah, 1975); Available Iron & Metal Co. v. First Nat'l Bank, 56 Ill.App.3d 516, 522–24, 13 Ill.Dec. 940, 945–946, 371 N.E.2d 1032, 1037–38 (1977). Contra, Security Trust Co. v. First Nat'l Bank, 79 Misc.2d 523, 358 N.Y.S.2d 943 (Sup.Ct. 1974).

10. The affidavit of David M. Stratton, Vice President of Operations for Lincoln, makes clear that the terms of the circular governed this transaction. Although the transaction did not involve the Federal Reserve Bank, Mr. Stratton attests that: "It is now and was in November-December, 1971, the practice in commercial banking to follow Federal Reserve procedures for giving notice of dishonor, regardless of whether the item is sent through the Federal Reserve System or, as in this case, through a correspondent collecting bank." Affidavit of David M. Stratton, ¶ 10, November 8, 1979.

Thus, the terms of the Operating Circular supersede the statutory provisions of article 4 in two distinct ways. The regulations are applicable as agreements "whether or not specifically assented to by all parties" under section 4–103(2). See Security Bank and Trust Co. v. Federal National Bank and Trust Co., 554 P.2d 119 (Okl.App.1976) (Federal Reserve operating letter requiring notice by wire supersedes section 4–301, which requires written notice from payor banks). Alternatively, the conduct of the parties can be said to have evinced an "agreement" under section 4–103(1). As the official comments to this section make clear, the word "agreement" is intended to incorporate the statutory definition set forth in U.C.C. § 1–201(3), which includes those agreements implied from commercial practice. Cf. Delbrueck & Co. v. Manufacturers Hanover Trust Co., 609 F.2d 1047, 1051, (2d Cir. 1979) ("The practices associated with banking transactions can be conclusive evidence of the legal effect of those transactions").

While "commercial practice" may not generally be considered an appropriate basis for summary judgment, in this case Lincoln and HNBT have met their burden of establishing that there remains no genuine issue of material fact. On the point here in question, Mr. Stratton's affidavit is uncontroverted. In spite of several opportunities, none of the parties have seen fit to file an opposing document. In fact, all three parties concur that there is no genuine issue of fact in the case. As the Second Circuit has noted: "A party opposing a motion for summary judgment simply cannot make a secret of his evidence until the trial, for in doing so he risks the possibility that there will be no trial. A summary judgment motion is intended to 'smoke out' the facts so that the judge can decide if anything remains to be tried." Donnelly v. Guion, 467 F.2d 290, 293 (2d Cir. 1972).

the transaction this operating circular provided that payor banks can—in fact, must—give notice by "wire" when they dishonor items with values in excess of $1,000.[11] "Wire" is expressly defined to include "telephonic" notices.[12] Thus, since this operating circular governed the transaction here in dispute, it is clear that Nevada's telephonic notice was an adequate notice of dishonor, and Wells Fargo was not entitled to wait for written notice.

As is indicated above, Wells Fargo's failure to give timely notice essentially precludes it from prevailing under any of the three counts in its complaint. Nonetheless, it has argued that it is entitled to relief under section 4–103(5), which provides in pertinent part:

"The measure of damages . . . is the amount of the item reduced by an amount which could not have been realized by the use of ordinary care . . ."

Wells Fargo argues that even if it had exercised "ordinary care" it would not have been able to protect Lincoln from a loss on the bad check. Lincoln had allowed Great Western to withdraw $23,000 of the $25,000 initially deposited by Mr. Porter within four banking days after the deposit. Wells Fargo argues that this is an unreasonably short time and that no amount of "care" on its part could have avoided the loss. In fact, even as of the first time that Wells Fargo received oral notice from Nevada—December 10, 1971—the funds had already been long since withdrawn from Lincoln's account. Thus, under section 4–103(5), Wells Fargo argues that it should not be saddled with the loss.

■ This argument misconceives the nature of the statute. By its terms, the statute is only applicable to "[t]he measure of damages for failure to exercise ordinary care in handling an item . . . ." In other words, the statute is designed to act as a shield in the hands of a negligent defendant. No cases have been cited to this court nor have any been found where the statute was allowed to act as a sword in the hands of a plaintiff. Consequently, in this case, where no one has filed a complaint against Wells Fargo alleging a lack of ordinary care, the statute is inapplicable.

■ An example may help to illuminate this distinction. If a collecting bank has failed to use ordinary care in handling an item but nonetheless is entitled to charge back to its customer,[13] its customer can bring a suit under section 4–202(1)[14] for damages arising out of the collecting bank's

---

In the absence of any opposition to Mr. Stratton's affidavit, the only reasonable conclusion this court can draw is that all parties concede it was the regular commercial practice to have Federal Reserve procedures govern private correspondent collecting banks.

11. Federal Reserve Operating Circular No. 6, ¶ 17(c) (September 1, 1967) provides:

"WIRE ADVICE of nonpayment of any item of $1,000 or over, unless it has not been paid because of a missing, irregular, or unsatisfactory endorsement or unless it bears on its face the legend, 'DO NOT WIRE NONPAYMENT,' of a Federal Reserve Bank or of a preceding bank endorser. Include in the advice of nonpayment, the amount of the item, the reason for nonpayment, the date of our cash letter, the name of the drawer or maker, and the names of the two endorsers immediately preceding the Federal Reserve Bank or their A.B.A. transit numbers, if any."

12. "For the purposes of this operating circular, the term 'wire' includes telephone, telegraph, and cable."
Id. ¶ 17 n.4.

13. "Thus charge-back is permitted even where nonpayment results from the depositary bank's own negligence." U.C.C. § 4–212, comment 5.

14. U.C.C. § 4–202(1) provides:
"A collecting bank must use ordinary care in (a) presenting an item or sending it for presentment; and (b) sending notice of dishonor or non-payment or returning an item other than a documentary draft to the bank's transferor [or directly to the depositary bank under subsection (2) of section 4–212] . . . after learning that the item has not been paid or accepted, as the case may be; and (c) settling for an item when the bank receives final settlement; and (d) making or providing for any necessary protest; and (e) notifying its transferor of any loss or delay in transit within a reasonable time after discovery thereof."

negligence. In such a case the collecting bank would then be entitled to diminish the extent of its liability pursuant to section 4–103(5). By contrast, the case before this court centers on the right of the collecting bank to charge back in the first instance. No countersuit for negligence has been filed, and consequently the question of damages for negligence is irrelevant.

### CONCLUSION

For the foregoing reasons, Wells Fargo's motion for summary judgment against HNBT and HNBT's motion for summary judgment against Lincoln are denied. HNBT's motion for summary judgment against Wells Fargo and Lincoln's motion for summary judgment against HNBT are granted.

So ordered.