**WESTERN AIR AND REFRIGERATION, INC., Plaintiff-Appellee,**

v.

**METRO BANK OF DALLAS, Defendant-Appellant.**

No. 77–1955.

United States Court of Appeals, Fifth Circuit.

July 20, 1979.

Rehearing Denied Sept. 5, 1979.

---

1. *See U. S. v. Donahey,* 529 F.2d 831, 832 (CA5, 1976).

84

Roy J. True, Dallas, Tex., for defendant-appellant.

James L. Truitt, John M. Skrhak, Jr., Dallas, Tex., for plaintiff-appellee.

Before COLEMAN, GODBOLD and IN-GRAHAM, Circuit Judges.

GODBOLD, Circuit Judge:

Western Air, the payee, presented a check to Metro Bank of Dallas, the payor bank, and it was dishonored for insufficient funds. Western presented the check again in person and was told there were insufficient funds to cover it. Following negotiations between Western, Metro and the drawer of the check, Metro held the check

for more than two weeks awaiting the availability of funds in the drawer's account. The funds did not become available, and Metro returned the check to Western again, dishonored because of insufficient funds. Western sued the bank, and after a bench trial the district court held the bank liable to Western under § 4.302, Texas Business & Commercial Code, adopted from the Uniform Commercial Code, which makes a payor bank liable when it does not timely act upon a demand item.

The district judge noted that under § 4.103 parties by agreement may vary their rights and liabilities, although some commentators have suggested that their right to vary the terms of their relationship as defined by the Uniform Commercial Code may be limited.[1] He found it unnecessary to base his decision on this point because he found no agreement expressly or implicitly varying § 4.302.

We reverse because the check was not presented for payment but was left by Western with the bank for collection when and if funds became available in the drawer's account. Also, this arrangement validly varied § 4.302.

Western, a California company, received a check from Harbor Boat Building Company in the amount of $21,537.20, dated August 11, 1975, drawn on Harbor's account in Metro Bank, and deposited the check in its bank account in California. When the check was presented to Metro for payment, after going through usual banking channels, payment was refused because of insufficient funds and the check was returned dishonored.

Furnish, the treasurer of Western, telephoned Metro on September 4, and was told there were sufficient funds in the account to cover the check. The next day he flew to Dallas, presented the check to a teller at Metro, was told there were insufficient funds to cover it, and the check was returned to him by the teller. He talked to Davenport, the bank president who told him that he was expecting funds to be deposited by Harbor that day. Furnish waited at the bank for funds to arrive. After a few minutes Davenport told Furnish that he had spoken with Farris, president of Harbor's parent company, and Davenport suggested Furnish go and talk to Farris.

Furnish met with Farris, who told him that the matter would be straightened out and the check honored that afternoon. Furnish returned to the bank in the afternoon and found that Farris and another officer of Harbor's parent company were meeting with Davenport. These three emerged from their meeting and talked with Furnish.

The district court found that in this conversation Furnish was "advised" that the problem with the Harbor check had been resolved and that the bank would pay it within the week and that Furnish left this meeting after being assured that the check would be paid. The court did not find who gave the "advice" or "assurance" that the check would be paid. Furnish did not testify to any representation by Davenport that the check would be paid but rather that someone, he could not recall who, told him the check would clear the following week, and that he (Furnish) "felt that the check would be paid."

If the foregoing findings were intended to reflect promissory undertakings by the bank they are clearly erroneous and are also irrelevant to the § 4.302 claims except insofar as they bear on the issues, discussed below, of whether the check when left with the bank was "presented" as a demand item and whether the parties made an agreement varying § 4.302. Application of § 4.302 does not depend upon whether the bank undertakes or agrees to pay the item. Strict liability follows as a matter of law. *New Ulm State Bank v. Brown*, 558 S.W.2d 20, 25 (Tex.Civ.App.1977); *Marfa National Bank v. Powell*, 512 S.W.2d 356, 358 (Tex.Civ.App.1974) (*writ refused n. r. e.*); *National City Bank of Rome v. Motor Contract Co.*, 119 Ga.App. 208, 166 S.E.2d 742 (1969).

1. *See* J. White & R. Summers, Uniform Commercial Code 556 (1972).

With respect to resolution of Harbor's financial problems, if such a representation had been made by Davenport it might have been circumstantial evidence of an undertaking by the bank to assure payment of the check, but Furnish did not attribute it to Davenport; instead he testified that one of the persons present told him they had resolved some of Harbor's financial problems, but he could not recall who it was.[2]

The overwhelming evidence is that on the afternoon of September 5 Furnish did not present the check as a demand item but left it with the bank for collection if and when funds came into the Harbor account with which to pay it. Furnish testified that it was suggested to him that the check be left with the bank for collection. This testimony followed:

Q But there at the conclusion of that meeting in the bank, when Mr. Farris and Mr. Rich Thomas emerged from their meeting with Mr. Davenport, someone in the group suggested that maybe the check would be paid next week and if you would leave it for collection with the bank the bank could collect it out of the funds when they were deposited, is that correct?

A That's correct.

Q This statement and this request could have been made by any one of the three parties, including Mr. Davenport, correct?

A Well, Mr. Davenport gave me the receipt and took the check for collection.

Q Okay. You stated that you did not request this particular receipt, Defendant's Exhibit 1, which is up there before you, but that is in fact the receipt that you did receive, is it not?

A Right.

Q You would have wanted some receipt for whatever you left there for collection, would you not?

A That's true.

Q So would it have been the orderly thing to do for you to request a receipt before you left that check?

A Yes.

Q And you did understand, did you not, from your conversations with Mr. Davenport that the purpose of your leaving that check was for Mr. Davenport and the Metro Bank to see if those funds could be collected out of the future deposits of Harbor Boat Building Company, out of their account there at that bank?

A That's true.

It was after this testimony that Furnish stated he "felt" that the check would be paid by the bank and that he did not know where the funds would come from.

In cross-examination Furnish was pressed with respect to specifically what Davenport said that led him to think Metro would pay the check whether or not Harbor funds were available. He responded, "Well, I don't recall his specific statements to me," and added that he "got the impression" that the financial problems concerning the check would be solved and the check would clear the following week and a cashier's check would be issued to him.

If there were any substantial doubt about the nature of the afternoon transaction it would be dissipated by the receipt given to Furnish by the bank. It described the Harbor check and stated "Received for collection from Western Air, P.O. Box 4548, Compton, California, 90224." Furnish made no objection to the terms of the receipt.

Davenport testified that Furnish told him that he (Furnish) had worked something out with Farris and that he (Davenport) stated that the bank would take the check for collection, to be held until Farris made a deposit, that Furnish requested the bank do this, and the bank then "entered" the check for collection. He testified that it was the ordinary practice of the bank to hold items for collection in this manner, hundreds of them each month, received by mail, through other banks and in person. He explained that an item presented for payment had to

---

2. Assuming the bank had assured Furnish that the check would be paid, it is possible that such an assurance would be enforceable only had it been in writing and signed by the bank. *See* Tex.Bus. & Comm.Code § 26.01(b)(2).

be paid or sent back unless it was "worked out" with the customer that it was to. be held for collection. Davenport described the receipt given to Furnish as the bank's standard form used for collection items.

Subsequent events sustain that the check was held for collection. Furnish returned to California and, during the next few days, made several calls to the bank. His description of these calls was not in terms of whether or when the bank would perform on any guarantee or assurance to him but rather they were inquiries concerning whether Harbor's check had "cleared." For example, after refreshing his recollection from his dairy, Furnish described a conversation on September 9 this way:

> September 9th, I called Davenport. He was in a meeting. His secretary checked on collection on the Harbor Boat check and still was not paid.

The district court found that on September 12 Davenport indicated to Furnish that the check had cleared and that a cashier's check would be sent that day. The evidence does not support this. First, Furnish testified that Davenport told him on the 12th that he "thought" the check would clear because a deposit had been made to the Harbor account of a check drawn on a California bank; later in his testimony Furnish said that Davenport told him the check "will clear." But the California check did not even enter the picture until September 16, when Harbor deposited in its Metro account a $36,000 check drawn on a California bank. Based on statements by Farris, Davenport thought the check would be good, thus it is possible that he did indicate on the 16th to Furnish (as the court also found that he did) that a cashier's check would be sent that day. On its books, on the 16th, the bank made a conditional credit to Harbor's account, reflecting that no funds were to be disbursed until it was determined whether the California check

would be honored. Davenport received no word on the 16th whether the check was good. On the 17th he was notified by telephone from the Federal Reserve Bank that it was not good.

On the 16th, anticipating that the California check would be good, Davenport had his collection teller prepare a cashier's check to Western for the amount of the Harbor check. No entry was made on Harbor's account to reflect purchase of a cashier's check, and the cashier's check was placed in a suspense file. When it was learned that the California check had bounced the cashier's check was voided. When the California check was returned dishonored Metro sent Western, on September 23, a second "hold for collection" receipt to give notice that it was continuing to hold the Harbor check to try to effect collection. On September 29, there having been no further developments, the bank returned the Harbor check to Western.[3]

Having concluded that the bank gave no promise or guarantee to Western Air that the check would be paid and that it was agreed the check would be held for collection, we turn to the application of the law to these facts. Section 4.302 provides that

> In the absence of a valid defense such as breach of a presentment warranty (Subsection (a) of Section 4.207), settlement effected or the like, if an item is presented on and received by a payor bank the bank is accountable for the amount of
>
> (1) a demand item other than a documentary draft whether properly payable or not if the bank, in any case where it is not also the depositary bank, retains the item beyond midnight of the banking day of receipt without settling for it or, regardless of whether it is also the depositary bank, does not pay or return the item or send notice of dishonor until after its midnight deadline; or

3. The district court found that the bank responded to Furnish's telephone inquiries of September 9 and 10 by telling him the [Harbor to Western] check had not cleared, and from this the court inferred that the bank was trying by these oral communications to give Harbor

time to come up with the money. The bank's statements were correct, and, as pointed out above, were in response to Furnish's inquiries whether the check had cleared. These direct and correct answers to Furnish's questions do not support the inference drawn.

(2) any other properly payable item unless within the time allowed for acceptance or payment of that item the bank either accepts or pays the item or returns it and accompanying documents.

There are at least two conditions relevant to this case that must be satisfied before a bank becomes liable under § 4.302 to the holder of a demand item for failure to settle for it prior to the bank's midnight deadline.[4] The demand item must be presented within the meaning of § 3.504, and the bank must be the payor bank. *See Engine Parts, Inc. v. Citizens Bank of Clovis*, 92 N.M. 37, 582 P.2d 809 (1978).[5]

The Texas Business Code defines presentment as "a demand for acceptance or payment made upon the maker, acceptor, drawee or other payor by or on behalf of the holder." Tex.Bus. & Comm.Code § 3.504(a). Comment 1 of the UCC Advisory Committee Notes to this section states that its purpose is to make clear that "any demand upon the party to pay is a presentment." There are two possible times when Western Air may have presented the check to Metro: the morning of September 5 when Furnish requested payment from a Metro teller and that afternoon when Furnish left the check with Metro in return for a collection receipt.

When Furnish delivered the check to the Metro teller there is no doubt that this constituted a presentment of the check to the payor bank. Nevertheless, this presentment cannot serve as the basis for Metro's liability under § 4.302. The teller informed Furnish that there were insufficient funds in Harbor Boat's account to cover the check and returned it to Furnish. Under § 4.302(1) a return of the item presented for payment before the payor bank's midnight

deadline relieves the bank of liability under that section.[6]

■ The discussion in the afternoon, concluded by Furnish's leaving the Boat Harbor check with Metro, did not constitute a demand for payment from the payor bank. The receipt that Furnish received in exchange for the check stated that the check would be held for collection and that Boat Harbor was the payor. The receipt makes clear that both Western Air and Metro were looking to Boat Harbor for the funds to pay the check. This case is similar to *Kirby v. Bergfield*, 186 Neb. 242, 182 N.W.2d 205 (1970). There the holder of a demand item called the payor bank and asked if there were sufficient funds in the drawer's account to cover the check. The payee argued that this constituted a presentment. The court disagreed, concluding that "[t]he telephone call in this case constituted an inquiry as to circumstances which might indicate whether the check would or would not be paid upon future presentment in due course. It was not a presentment and demand for payment envisioned by section 3–504." *Id.* at 247, 182 N.W.2d at 208. The court required an immediate demand for payment. A step preliminary to that present demand for payment did not constitute a presentment. In this case, leaving the check with Metro was a preliminary step. The parties knew that until Harbor Boat deposited funds sufficient to cover the check issued to Western Air, Metro would not pay the check. Leaving a check with a bank with this type of understanding is not a present demand for payment and not a presentment within the meaning of § 3–504.

Other state court cases which have dealt with whether there has been a presentment

---

**4.** Tex.Bus. & Comm.Code § 4.104(a)(8) provides:

"Midnight deadline" with respect to a bank is midnight on its next banking day following the banking day on which it receives the relevant item or notice or from which the time for taking action commences to run, whichever is later.

**5.** Other conditions include the violation of the midnight deadline and the lack of defenses for

the payor bank such as a breach of warranty of presentment. *Id.*

**6.** It is also clear that the teller's refusal to pay the check and return of it to Furnish constituted a notice of dishonor within the meaning of § 3.508. Notice of dishonor before the midnight deadline also relieves the payor bank of liability under § 4.302.

in situations similar to this case, have reached a contrary result, but all are distinguishable. In *Engine Parts, Inc. v. Citizens Bank of Clovis, supra,* a payor bank, Citizens Bank of Clovis, argued that receipt of a draft from a depositary bank [7] accompanied by a letter indicating that the draft was to be paid through it, is not a demand for payment and therefore not a presentment. The depositary bank incorrectly thought that another party was the drawee and that Clovis was only a collecting bank. The court rejected the argument concluding that the "process of collection is . . . simply an attenuated demand for payment. Each collecting bank in the chain of collection becomes an agent for the owner of the item and acts for him to demand payment of the drawee. . . . When the [depositary bank] sent the drafts to the Clovis Bank, even though it thought it was demanding payment through another collecting bank, it was in fact demanding payment 'upon . . . the drawee.' Thus it effectively presented the drafts upon the Clovis Bank." *Id.* at 43, 582 P.2d at 815. The transmittal letter to Clovis also included the instructions "return at once if not paid on maturity. If unpaid give full reason." The court in *Farmers Cooperative Livestock Market, Inc. v. Second National Bank of London,* 427 S.W.2d 247 (Ky.App. 1968), reached the same conclusion that a depositary bank's forwarding of a demand item to the payor bank is a demand for payment even though the transmittal letter stated that the item was being forwarded for collection, because the letter also contained the instruction "Please wire if unpaid upon arrival." *Id.* at 250; *accord, Kane v. American National Bank & Trust,* 21 Ill.App.3d 1046, 316 N.E.2d 177 (1974).

■ Both *Engine Parts* and *Farmers Cooperative* arose from the transmittal of demand items through normal banking channels. In both cases the forwarding bank mistakenly added in its transmittal letter that the item was being forwarded for collection even though it was being sent to the payor bank. In both cases, in addition to requesting collection, the transmittal letter made clear that the forwarding bank was demanding payment. When a demand item arrives at a payor bank there is a presentment even if there is a mistaken request for collection when it is clear that a demand for payment is made. In this case there was no mistake. Before Western Air left the check with Metro the bank on two occasions (once when presented through banking channels and once when presented to the teller) had refused to pay the check. Western Air left the check for collection, to be paid if and when Harbor Boat deposited sufficient funds to cover the check. This was not a presentment.

■ The facts which lead us to the conclusion that there was no presentment also lead to a conclusion that the parties agreed under § 4.103 that the midnight deadline of § 4.302 did not apply to the transaction in this case. Section 4.103(a) provides that

The effect of the provisions of this chapter may be varied by agreement except that no agreement can disclaim a bank's responsibility for its own lack of good faith or failure to exercise ordinary care or can limit the measure of damages for such lack or failure; but the parties may by agreement determine the standards by which such responsibility is to be measured if such standards are not manifestly unreasonable.

The Texas courts have recognized that the parties may agree to vary the time requirements of § 4.302. *New Ulm State Bank v. Brown, supra* at 28. The courts of other states have reached the same conclusion. In *Available Iron & Metal Co. v. First National Bank,* 56 Ill.App.3d 516, 13 Ill.Dec. 940, 371 N.E.2d 1032 (1977), the court stated that "Section 4–103(1) makes any agreement which negates or nullifies the *effect* of section 4–302 (here, the bank's liability for the checks), a valid defense." *Id.* at 523, 13 Ill.Dec. at 947, 371 N.E.2d at 1039 (emphasis in original). Similarly, in *Sun River*

7. Depositary bank means "the first bank to which an item is transferred for collection even though it is also the payor bank." Tex.Bus. & Comm.Code § 4.105(1).

*Cattle Co. v. Miners Bank of Montana,* 521 P.2d 679 (Mont.1974), the court recognized that there may be an agreement to vary the effect of § 4–302, but that on the facts before it, there was insufficient evidence to prove an agreement.[8]

According to Comment 2 to § 4–103 " 'agreement' has the meaning given to it by Section 1–201(3)."

"Agreement" means the bargain of the parties in fact as found in their language or by implication from other circumstances including course of dealing or usage of trade or course of performance as provided in this title (Sections 1.205 and 2.208). Whether an agreement has legal consequences is determined by the provisions of this title, if applicable; otherwise by the law of contracts (Section 1.103). (Compare "Contract").

Tex.Bus. & Comm.Code § 1.201(3). We think that the receipt given to Western Air contains the substance of their bargain and that the implications drawn from the conduct of both parties after the check was left with Metro indicate that the parties agreed that Metro would pay the check only if funds became available, even though Metro was the payor bank for the check as originally drawn, and that they agreed that Metro would hold the check, without regard to its midnight deadline, for a reasonable period of time to see if funds became available.

■ The district court's finding that there was no agreement to vary the effect of § 4.302 is clearly erroneous. Moreover, the court used the wrong legal standard for determining whether there was an agreement. It stated that § 4.103 should be relied on only in clear circumstances. There is no such requirement in the Code. Comment 2 to § 4–103 makes clear that the regular rules for determining whether there was an agreement between the parties applies to § 4.302.

■ Metro bank contends that it was not the payor bank. We do not agree. While there is little doubt that Metro was acting as a collecting means for Western Air, its status as the payor bank was not changed by its efforts to collect the check. The Code defines payor bank as "a bank by which an item is payable *as drawn* or accepted." Tex.Bus. & Comm.Code § 4.105(2) (emphasis added). The check as drawn was payable by Metro. Nothing that occurred subsequent to Harbor Boat's writing the check altered Metro's status as payor. The receipt issued to Western Air states that the Harbor Boat check was being held for collection and that Harbor Boat was the payor. Listing Harbor Boat as payor in the receipt did not change Metro's status as the payor on the check *as drawn. See Engine Parts, Inc. v. Citizens Bank of Clovis, supra* 92 N.M. 37, 582 P.2d 809 (status of negotiable instrument determined from its face). Metro could not be a "collecting bank" as defined by the Code because § 4.105(4) defines a "collecting bank" as "any bank handling the item for collection *except the payor bank."* (emphasis added).[9]

---

**8.** In addition to the limitations on agreements to vary provisions of the Code contained in § 4.103(a), a bank may not disclaim its duty of good faith or failure to exercise due care, *see Manufacturer Hanover Trust Co. v. Akpan,* 91 Misc.2d 622, 398 N.Y.S.2d 477 (1977), Professors White and Summers suggest that the parties may not agree to "depart from legislative statements of public policy." J. White & R. Summers, Uniform Commercial Code 556 (1972). Although the authors cite no cases in support of their position, they note that this "basic" contract principle is incorporated into the Code through UCC §§ 1–103. Assuming that the position of White and Summers is sound, no public policy is defeated by the agreement in this case. We have noted that the relevant policy concern underlying § 4–302

is to assure that payor banks will not act to the detriment of a payee in order to protect the credit rating of its customers. There is also the more general policy of speeding the collection of checks through the banking system. The agreement in this case was not to the detriment of Western Air. It provided the best possibility for Western Air to collect on the check.

**9.** Metro's reliance on *Wilhelm Foods, Inc. v. National Bank of North America,* 382 F.Supp. 605 (S.D.N.Y., 1974), is misplaced. In *Wilhelm,* National was not a payor bank because the court concluded that it had neither accepted the check nor was it the drawee. In this case, there is no question but that Metro was the drawee and, therefore, the payor bank.

Western asserted two other theories of recovery that the district court did not reach—that Metro "accepted" the Harbor check and notified Western of its acceptance, and that Metro was liable to Western for the cashier's check typed up on September 16 (as a suspense item) but never charged to Harbor's account or delivered, and later voided. Our discussion above makes clear that the first is without merit. The second is frivolous.

REVERSED with directions to enter judgment for the defendant.