Jimmie L. HART, Plaintiff-Appellant,

v.

Marilyn SIMS and Deloy Sims, husband and wife; James A. Shelton, Defendants-Appellees.

No. 81–1326.

United States Court of Appeals, Fifth Circuit.

April 11, 1983.

Rehearing Denied July 1, 1983.

Luther Jones, El Paso, Tex., Luther E. Jones, Jr., Corpus Christi, Tex., for James M. Shelton.

Before CLARK, Chief Judge, GEE and GARWOOD, Circuit Judges.

GARWOOD, Circuit Judge:

This is an appeal from a directed verdict granted by the district court for appellee in a diversity action brought by appellant to establish his title to, and to recover possession of, a painting. The primary question is whether appellant's agent, who had purchased the painting for him, had a right to resell the painting to appellee. We hold that a resale of the painting by the agent to appellee was authorized, and that appellee has title to it. The district court's judgment is therefore affirmed.

## I.

Appellant Jimmie L. Hart ("Hart"), a resident of Oklahoma, wanted to buy a certain painting, the "Cayuse on the Touchet" by the noted western artist, John Clymer. Hart made an agreement with an art dealer, Marilyn Sims of Houston, Texas, whereby Mrs. Sims agreed to buy the painting for him at the American Cowboy Artists Show, which was held in Phoenix, Arizona, on October 26, 1979.

Under the rules of the show, a prospective buyer would place his name on an "intent to purchase" slip and deposit it in a separate box for each painting to be sold. If the buyer's name were drawn, he had fifteen minutes in which to pay one half of the purchase price for the painting.

Acting on behalf of Mrs. Sims, Shirley Brawner placed her "intent to purchase" slip in the box for the "Cayuse on the Touchet." Mrs. Brawner's name was drawn, and the painting was sold to Mrs. Sims for $45,000 on October 26, 1979. Mrs. Sims wrote a personal check to Clymer for $22,500, which was one half of the purchase price. Under the rules of the show, the

Johnson, Welliever, Buckley & Otto, John P. Otto, Phoenix, Ariz., for plaintiff-appellant.

balance was due in thirty days, which would be November 25, 1979.

Appellee James Shelton ("Shelton"), a resident of El Paso, Texas, was also at the show. He had placed his name in the box for the "Cayuse on the Touchet." Shortly after Mrs. Sims made her down payment for the painting, Shelton offered her $60,-000 for it. Mrs. Sims told Shelton that she was not at liberty to sell the painting to him because she had already promised to sell it to someone else.

Hart thereafter, in late October or early November 1979, reimbursed Mrs. Sims for the down payment, and paid her a 10 percent commission, which she split with Mrs. Brawner. Hart agreed to pay Mrs. Sims the balance of the purchase price on or before November 25, 1979, which was the last day for her check to Clymer to be postmarked. Hart, however, with Mrs. Sims's approval given in a telephone conversation on November 23 or 24, did not mail Mrs. Sims a check until Saturday, November 24, 1979, and it was not delivered to her in Houston until after banking hours on Monday, November 26, 1979 (the Monday following Thanksgiving). Although Mrs. Sims was apparently entitled to certified funds, there is evidence that on or after November 23 she indicated to Hart her willingness to accept an uncertified check drawn on Hart's personal account.[1] Meanwhile, in order to avoid her own default, on Sunday, November 25, 1979, Mrs. Sims had sent her personal check payable to Clymer for the balance of the purchase price to the Cowboy Artists of America in Kansas City, Missouri.

On the morning of Tuesday, November 27, 1979, Mrs. Sims's husband took Hart's check to her bank, the Harris County Bank, in Houston, to deposit it. Because the amount of the check was so large and be-

cause it was drawn on an out-of-town bank, the Harris County Bank would not allow an immediate credit to be made to Mrs. Sims's account. Mr. Sims told the bank that the check was good, and the Harris County Bank called Hart's bank, the National Bank of Commerce of Dallas, Texas, to verify it. The Harris County Bank learned, however, that the check was drawn against insufficient funds. Nevertheless, Mr. Sims deposited the check into Mrs. Sims's account, and the bank sent the check on through normal banking channels. See Tex.Bus. & Com. Code Ann. § 4.201(a).

That afternoon, Mrs. Sims called Hart to tell him that his check was insufficient. Hart told Mrs. Sims that he had obtained a loan from his bank the previous day to cover the check, but that the loan proceeds had not yet been posted to his account.

On the afternoon of Wednesday, November 28, 1979, Don McCulley, an art dealer in Dallas, Texas, called Mrs. Sims to warn her about dealing with Hart. The substance of what McCulley told her was that there was a strong possibility that Hart's check would not be made good. McCulley offered to "bail out" Mrs. Sims if she needed him to do so. Mrs. Sims, however, declined his offer of help.

Mrs. Sims then called Hart's bank and learned that the check was still insufficient. McCulley called again and told her that the Cowboy Artists Association had recently begun to verify each check that was sent to it in payment for a painting before forwarding the check on to the artist. Mrs. Sims was "scared to death" by this information. McCulley asked her what she would take for the painting, and she told him $63,000. McCulley said that this was too much for the painting, and offered to pay her $45,000 if she needed him to buy it.

---

1. The list of mutually agreed facts in the pretrial order includes the following: "Pursuant to the agreement between Marilyn Sims and Jimmie L. Hart, Jimmie L. Hart was to pay Marilyn Sims the balance of $22,500.00 on or before November 25, 1979." Mrs. Sims's November 1, 1979 invoice to Hart called for "certified funds," and she testified a certified check was required. Although Hart testified that in the November 23 or 24 conversation Mrs. Sims apparently acquiesced in his plan to mail a personal check on November 24, he did not expressly dispute that the underlying agreement called for cash or certified check or similar current funds.

After talking to McCulley, Mrs. Sims called Hart about 3:30 or 4:30 p.m. on November 28, 1979, and told him that she was not going to wait for his check to clear the bank, and that if he did not have the money wired to her bank account by 10:00 a.m. on Thursday, November 29, 1979, then she was going to sell the painting to someone else. Mrs. Sims explained to Hart that she feared ill-consequences would result to her business if her own check bounced. Hart, who was in Oklahoma City, told Mrs. Sims that he would go to Dallas the next morning and "take care of it."

Mrs. Sims then contacted Shelton and informed him that if he were still interested, the painting might be for sale the next day for $60,000, the amount that Shelton had originally offered her for the painting in Phoenix. Shelton said that he was still interested, and Mrs. Sims told him that she would let him know the next day if the painting were, in fact, available for sale.

The next morning, Thursday, November 29, 1979, about eight o'clock, Hart called Mrs. Sims and obtained from her the name of her bank and her account number. He told her, "It's all going to be taken care of in just a few minutes." At 10:00 a.m., however, Hart called Mrs. Sims again to tell her that the problem with the check had been caused by two postdated checks issued to 3–B Operating Company ("3–B"), a business in Graham, Texas, which had, by mistake, been deposited by 3–B without his knowledge and had been paid by his bank. Hart also told her that 3–B had agreed to return the funds, and that they were in the process of being wired from the Graham National Bank to his bank; but that because of this error, he could not meet the 10:00 a.m. deadline. Mrs. Sims agreed to extend the deadline to 2:00 p.m.

Mrs. Sims then called Hart's banker, Oscar Lindermann. Lindermann refused Mrs. Sims's request that the bank honor Hart's check, but he did tell her that the money would be wired into her account as soon as the funds were received from the Graham bank. Because of an error on the part of the Graham bank, the money was not wired to Hart's bank until 2:34 p.m., and not to Mrs. Sims's bank until 3:04 p.m. At 2:48 p.m., however, Mrs. Sims had sent Hart a telegram cancelling the sale to him, and ten minutes later, she had sent a telegram to Shelton confirming the sale of the painting to him for $60,000. Mrs. Sims therefore refused to accept Hart's belated wire transfer of funds, and the money was returned by wire to his bank.[2] Hart placed a stop payment on his check on November 30, 1979. The stop payment order form stated "paid by wire" as the reason for the stop payment. The check was not presented to Hart's bank until December 4, 1979.

Hart sued Mr. and Mrs. Sims and Shelton in federal district court to establish his title to, and to recover possession of, the painting. Shortly before trial, Hart settled with Mr. and Mrs. Sims. The case was tried before a jury, but at the conclusion of the evidence, the district court granted Shelton's motion for a directed verdict, and rendered judgment for him.

## II.

The parties agree that this dispute is governed by the provisions of the Uniform Commercial Code as adopted in Texas. See Tex.Bus. & Com.Code Ann. § 1.101, et seq. It is undisputed that Mrs. Sims had become responsible for the balance of the purchase price on behalf of her principal, Hart. Under section 2.707,[3] "A 'person in the position of a seller' includes as against a principal an

---

**2.** Shortly after Mrs. Sims sold the painting to appellee, she offered to return to appellant the amount of the down payment plus the 10 percent commission.

**3.** Section 2.707 provides:

"'Person in the Position of a Seller'

"(a) A 'person in the position of a seller' includes as against a principal an agent who has paid or become responsible for the price

of goods on behalf of his principal or anyone who otherwise holds a security interest or other right in goods similar to that of a seller.

"(b) A person in the position of a seller may as provided in this chapter withhold or stop delivery (Section 2.705) and resell (Section 2.706) and recover incidental damages (Section 2.710)."

agent who has paid or become responsible for the price of goods on behalf of his principal ...." Where a buyer fails to make a payment due on or before delivery a "person in the position of a seller" may resell and recover damages under section 2.706. Section 2.703.[4]

The evidence shows that Hart had until 2:00 p.m. on November 29, 1979, to pay Mrs. Sims the balance of the purchase price for the painting. The question therefore is whether Hart "fail[ed] to make a payment due on or before delivery."

Hart's primary argument is that the payment by personal check to Mrs. Sims was a conditional payment, which, under section 3.802[5] suspended the underlying obligation until the check was presented to his bank for payment. Hart claims that at the time Mrs. Sims sold the painting to Shelton, he was not in default under section 2.703, since it is undisputed that his check had not been presented for payment to his bank, and that Mrs. Sims therefore had no right to resell the painting to Shelton under section 2.706. We disagree.

Under section 3.511,[6] presentment of a negotiable instrument may be excused when the party to be charged has waived it expressly or by implication either before or after it is due. Section 3.802 does not suspend the underlying obligation if presentment for payment has been waived by the drawer or maker of the instrument.[7] *Canal-Randolph Anaheim, Inc. v. Moore*, 78 Cal.App.3d 477, 143 Cal.Rptr. 789 (1978).

Here, the evidence shows that Hart waived presentment of his check. In the mid-afternoon of November 28, in response to Mrs. Sims's demand that funds be wired to her bank account by ten o'clock the next morning, Hart said he would "take care of it." About 8:00 a.m. the next day, Hart,

---

**4.** Section 2.703 provides:

"Seller's Remedies in General

"Where the buyer wrongfully rejects or revokes acceptance of goods or fails to make a payment due on or before delivery or repudiates with respect to a part or the whole, then with respect to any goods directly affected and, if the breach is of the whole contract (Section 2.612), then also with respect to the whole undelivered balance, the aggrieved seller may

"(1) withhold delivery of such goods;

"(2) stop delivery by any bailee as hereinafter provided (Section 2.705);

"(3) proceed under the next section respecting goods still unidentified to the contract;

"(4) resell and recover damages as hereafter provided (Section 2.706);

"(5) recover damages for non-acceptance (Section 2.708) or in a proper case the price (Section 2.709);

"(6) cancel."

**5.** Section 3.802 provides:

"Effect of Instrument on Obligation for Which It Is Given

"(a) Unless otherwise agreed where an instrument is taken for an underlying obligation

"(1) the obligation is pro tanto discharged if a bank is drawer, maker or acceptor of the instrument and there is no recourse on the instrument against the underlying obligor; and

"(2) in any other case the obligation is suspended pro tanto until the instrument is due or if it is payable on demand until its present-

ment. If the instrument is dishonored action may be maintained on either the instrument or the obligation; discharge of the underlying obligor on the instrument also discharges him on the obligation.

"(b) The taking in good faith of a check which is not postdated does not of itself so extend the time on the original obligation as to discharge a surety."

**6.** Section 3.511 provides, in part:

"Waived or Excused Presentment, Protest or Notice of Dishonor or Delay Therein

". . .

"(b) Presentment or notice or protest as the case may be is entirely excused when

"(1) the party to be charged has waived it expressly or by implication either before or after it is due; or

"(2) such party has himself dishonored the instrument or has countermanded payment or otherwise has no reason to expect or right to require that the instrument be accepted or paid; or

"(3) by reasonable diligence the presentment or protest cannot be made or the notice given."

**7.** Presentment of Hart's check was not made by Mrs. Sims's telephone calls to his bank inquiring whether his account had sufficient funds to cover the check. *Kirby v. Bergfield*, 186 Neb. 242, 182 N.W.2d 205 (1970). *See Western Air and Refrigeration, Inc. v. Metro Bank of Dallas*, 599 F.2d 83 (5th Cir.1979).

obtaining from Mrs. Sims the information to make the wire transfer to her account, told her it was "all going to be taken care of in just a few minutes." At 10:00 a.m., Hart procured from Mrs. Sims an extension until 2:00 p.m. of the deadline for completing the wire transfer to her account. Hart went to his bank on November 29, 1979, in an attempt to have the funds transferred by Mrs. Sims's 2:00 p.m. deadline. The funds were actually transferred to Mrs. Sims's bank at 3:04 p.m., and Hart stopped payment on his personal check with an order form giving "paid by wire" as the reason. We hold that this evidence conclusively establishes that Hart impliedly waived presentment of his personal check. Hart's obligation to Mrs. Sims was therefore not suspended, and he was in default under section 2.703, a default which authorized a resale of the painting to Shelton under section 2.706.

■ Hart makes one final argument in support of his contention that the resale to Shelton was unauthorized. We understand Hart's argument to be that Mrs. Sims had waived his initial default in failing to make payment in cash or by certified funds for the balance of the purchase price of the painting by November 25, 1979, when she agreed to accept his admittedly tardy uncertified personal check, which served as a conditional payment, and that she could not then retract her waiver by demanding payment through a different manner, namely, payment in cash through a wire transfer of funds. We disagree.

Section 2.209(e) provides that:

"A party who has made a waiver affecting an executory portion of the contract may retract the waiver by reasonable notification received by the other party that strict performance will be required of any term waived, unless the retraction would be unjust in view of a material change of position in reliance on the waiver."

There is no evidence that Mrs. Sims's retraction was unjust or that Hart materially changed his position in reliance on the waiver. Hart's check was received on November 26, 1979. If Mrs. Sims had taken the check to Hart's bank in Dallas on November 27, 1979, and presented it for payment, as she could have, the bank would have refused to pay it, for Hart did not have sufficient funds on deposit. On November 27, 1979, Mrs. Sims called Hart to tell him that his check was drawn against insufficient funds. On November 28, 1979, the check was still insufficient. Mrs. Sims, fearing that her own check (which had been mailed on November 25) would bounce, called Hart on the afternoon of November 28 to explain her situation to him, to tell him that she could not wait for his check to clear the bank, and to insist on payment in cash by wire transfer of funds to be made into her account by ten o'clock the next morning. Mrs. Sims continued to work with Hart by extending her 10:00 a.m. deadline for four more hours, and by asking his banker to honor his check, which the banker refused to do.

There was also no material change of position on Hart's part. Whether payment was to be made by personal check or by a wire transfer of funds, Hart still had to make sure that there were sufficient funds in his account to cover the payment, and he had, in fact, made such arrangements on November 26 or 27, 1979, when he obtained a loan from his bank to finance the purchase of the painting. The arrangements therefore had been made before Mrs. Sims's retraction, and but for a series of errors unrelated to anything Mrs. Sims did, the money would have been in Hart's account.

In sum, the evidence shows, as a matter of law, that Mrs. Sims was just in her efforts to obtain payment from Hart, and that under the circumstances, Hart was given reasonable notice that payment must be made by a wire transfer of funds and a reasonable time in which to make the wire transfer. We hold therefore that Mrs. Sims effectively and properly retracted her waiver, and that Hart was required to make payment in cash by means of a wire transfer of funds by 2:00 p.m. on November 29, 1979. *See Nora Springs Cooperative Company v. Brandau,* 247 N.W.2d 744 (Iowa 1976); *Cozby v. Edwards,* 203 S.W.2d 569,

**580**

576 (Tex.Civ.App.—Fort Worth 1947, writ ref'd n.r.e.).

Because we have held that the sale to Shelton was authorized, title to the painting became vested in him regardless of his knowledge of Hart's involvement in the transaction. We need not therefore reach appellant's contention that Shelton was not a good faith purchaser.

The district court's judgment is affirmed.

AFFIRMED.