[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
SEP 02 2003
THOMAS K. KAHN
CLERK

No. 02-14372
_____

D. C. Docket No. 98-02868-CV-WMH

SCADIF, S.A., a Foreign Corporation,

Plaintiff-Appellant,

versus

FIRST UNION NATIONAL,
a National banking association,

Defendants-Third-Party-
Plaintiff-Appellee,

AMERIPLEX GROUP, INC.,

Third-Party-Defendant.
_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(September 2, 2003)

Before ANDERSON, COX and MAGILL*, Circuit Judges.

_____
    *Honorable Frank J. Magill, U.S. Circuit Judge for the Eighth Circuit, sitting by designation.

MAGILL, Circuit Judge:

Plaintiff-Appellant SCADIF, S.A. ("SCADIF") appeals the district court's judgment in favor of Defendant-Appellee First Union National Bank, n/k/a Wachovia Bank ("First Union"). SCADIF alleges that First Union is strictly liable to SCADIF for approximately $3.2 million because First Union failed to pay or return a check for this amount before the "midnight deadline," as required by the Uniform Commercial Code ("UCC"), as codified in Florida. The district court found that SCADIF sent the check at issue to First Union for collection rather than for payment, and therefore, the midnight deadline rule does not apply. The court entered judgment for First Union and, in addition, denied SCADIF's motion for sanctions, finding that any misconduct by First Union during the trial did not merit the imposition of sanctions. SCADIF appeals.

Our jurisdiction is proper pursuant to 28 U.S.C. § 1291 (2000). For the following reasons, we affirm.

**I.**

We review, as summarily as possible, the somewhat complicated factual background behind the deal leading up to First Union's receipt of the check at issue, as this background is relevant to our disposition of the case.

2

## A.

SCADIF, a French company, is a buying cooperative that purchases and supplies goods to twenty-two hypermarket[1] stores in Paris, France. In the early 1990's, SCADIF anticipated a change in a French law that limited the retail sales of parapharmaceuticals[2] to licensed pharmacies. SCADIF arranged for a non-French company, I.Tra.S., to purchase parapharmaceuticals on its behalf by misrepresenting that the goods would be sold outside of France. Through I.Tra.S., SCADIF purchased more than $3 million worth of products.

In 1996, with no change in the law having occurred, I.Tra.S. agreed to repurchase the parapharmaceuticals and reimburse SCADIF for its shipping and storage costs. To facilitate this repurchase, I.Tra.S. obtained a loan from a Swiss bank. The Swiss bank made the loan after, at SCADIF's request, Banque Francaise, a French bank with whom SCADIF had a previous relationship, guaranteed the loan. SCADIF in turn guaranteed Banque Francaise's obligation to the Swiss bank.

In order to meet its obligation to the Swiss bank, inter alia, I.Tra.S. obtained

---

[1] A hypermarket store is one that sells a wide variety of goods at discount prices, similar to a Sam's Club or Wal-Mart.

[2] Parapharmaceuticals are non-prescription medicines and medical supplies.

3

a loan commitment from Ameriplex Group, Inc. ("Ameriplex"), a Canadian corporation. However, Ameriplex never funded the loan, despite its repeated promises to do so, as described below.

In November 1997, Ameriplex commenced a serious of contacts with SCADIF and/or Banque Francaise assuring imminent funding. By letter dated January 12, 1998, Ameriplex notified Banque Francaise that the promised funding had been delayed by "unforeseen changes . . . beyond our control." Ameriplex copied SCADIF on this letter.

On January 31, 1998, Banque Francaise was forced to honor its guarantee, as I.Tra.S. was unable to repay the Swiss bank. Banque Francaise debited SCADIF's account for the amount it paid. Finally, on April 3, 1998, Ameriplex sent SCADIF a post-dated check for $3,215,183 ("Check").[3] Along with the Check, Ameriplex sent a letter providing that SCADIF had " agreed to retain the cheque and not deposit same." SCADIF complied with these conditions for three and one-half months.

_____

[3] Several interesting features of the Check are relevant to this appeal: (1) the Check was drawn on an account opened and maintained at a First Union in Sarasota, Florida; (2) the Check was a starter check for a new account, with only the name "Ameriplex Group, Inc." typed on it; (3) the Check was hand-numbered as "0002"; (4) the Check was handwritten; (5) there was a discrepancy between the numeric and the word amount on the Check; and (6) the only First Union address included on the Check was "First Union National Bank of Florida, Sarasota, Florida 34236," although the following was written on the Check: "Branch 273."

During this three and one-half month period, on April 21, 1998, Ameriplex sent a stop-payment order on the Check. The record shows that the average daily balance of the account on which the Check was drawn was $3.83 from inception. On May 5, 1998, Ameriplex informed Banque Francaise via letter that Ameriplex's unidentified lender had attempted to transfer funds into the account, but that the Federal Reserve had imposed a hold. Banque Francaise informed SCADIF of this communication. On May 11, Ameriplex wrote Banque Francaise again, stating that it would exhibit proof of funds by May 13; this did not occur. Similar communications continued. On June 12, Ameriplex sent a letter to I.Tra.S., copying both Banque Francaise and SCADIF, stating that Ameriplex's president, Peter Giannotti ("Giannotti"), would arrive in Paris on June 18 to settle Ameriplex's obligations. Giannotti did not appear in Paris, and Ameriplex never provided proof of funds to Banque Francaise or SCADIF.

On July 20, 1998, one month after Giannotti's failure to show, SCADIF sent the Check to Banque Francaise via regular mail. Included with the Check was a letter directed to Banque Francaise's International Department providing: this "confirm[s] our telephone conversation of today whereby we instructed you to send for collection the Ameriplex Group, Inc.'s April 14, 1998 check in the amount of [$3,215,183.00]."

5

Banque Francaise did not provisionally credit the Check to SCADIF's account and never extended any credit or payment thereon to SCADIF. Rather, Banque Francaise separated the Check from other checks it received that were drawn on United States banks. It sent the Check individually to First Union via Airborne Express along with a form letter ("Collection Letter") identifying the transaction as a "Collection Payable Abroad."

The Collection Letter provided that the Check was being sent for collection, identified Ameriplex as the drawee from whom payment should be obtained, requested payment or notice of dishonor, and requested payment of Banque Francaise's fees. The Collection Letter also required First Union to respond to Banque Francaise via SWIFT, a telex system used for international bank communications. The Collection Letter recognized that First Union would assess fees for the collection service, and it instructed First Union to collect these fees directly from the drawee, Ameriplex. Banque Francaise did not, as it does with most checks drawn on a United States bank, forward the Check to its correspondent United States bank, Citibank of New York, for processing through the Federal Reserve System. Instead, it sent the Check as a one-of-a-kind item directly to First Union.

Banque Francaise sent the Check and the Collection Letter addressed to

"First Union National Bank of Florida, Sarasota, Florida 34236," as this was the only address provided on the Check. See supra n.3. At this time, First Union had two branches located in the 34236 zip code, each operating separately: one in St. Armands ("St. Armands branch") and one in Center City ("Center City branch"). Ameriplex's account was held at the St. Armands branch; however, as the routing slip did not specify a branch, Airborne Express delivered the Check to the Center City branch.

The Check arrived at the City Center branch on July 24, 1998. Due to human error, the Check was not sent, as it should have been, to First Union's international operations department ("International Operations"). On July 30, Banque Francaise sent a SWIFT inquiry to International Operations, inquiring about the Check. The following day, after receiving no response, Banque Francaise sent a second inquiry via SWIFT.

On August 5, First Union located the Check and the Collection Letter and overnighted them to International Operations. First Union immediately informed Banque Francaise of this delivery. The following day, nine banking days after receipt of the Check, International Operations notified Banque Francaise that the Check was being returned unpaid because of the previous stop-payment order and the discrepancy between the written and the numerical amount on the Check. This

7

same day, August 6, First Union sent Banque Francaise a SWIFT message and returned the Check via Federal Express. In this same correspondence, First Union requested reimbursement from Banque Francaise for its cable charges. Banque Francaise paid these charges.

**B.**

SCADIF filed suit, claiming that First Union was strictly liable for the amount of the Check, $3,215,183, because it failed to pay or return the Check within the midnight deadline. The district court entered judgment for First Union, finding that the Check was sent for collection rather than payment, and therefore, the midnight deadline rule did not apply. The district court also found that First Union's handling of the Check did not cause SCADIF any loss or injury.

SCADIF also filed a motion for sanctions two months after the trial, alleging, inter alia, (1) concealment of documents by First Union, and (2) misconduct by First Union and one of its witnesses, Professor Barkley Clark. The district court denied the motion, finding that any misconduct by First Union during the trial did not merit the imposition of sanctions. SCADIF appeals the judgment in favor of First Union and the denial of sanctions.

**II.**

First, we examine whether the district court erred in finding that the Check

was sent for collection rather than payment, thereby holding that the midnight

deadline rule was not applicable and entering judgment for First Union. One

question is dispositive of this issue: whether the parties agreed that the Check was

sent to First Union for collection and therefore not presented for payment. In

other words, did the parties agree that First Union was to pay upon the Check *if*

*and when* there were sufficient funds in Ameriplex's account to cover the Check.

We find that the parties did reach such an agreement, in accordance with Florida

law, and therefore, the midnight deadline rule is not applicable.

**A.**

The midnight deadline rule provides that a payor bank[4] that is presented[5] a

check must return the check before midnight of the following banking day in order

to revoke settlement; otherwise, the payor bank is liable for the amount of the

check. See Fla. Stat. ch. 674.302 (2002).[6] This rule, by its own terms, applies

---

[4] In the absence of an agreement to the contrary, First Union would be the payor bank under the definition of "payor bank" in the UCC. Fla. Stat. ch. 674.105(3) (2002).

[5] "Presentment" is defined by UCC Article 3 as "a demand made by or on behalf of a person entitled to enforce an instrument: (a) To pay the instrument made to the drawee or a party obliged to pay the instrument or, in the case of a note or accepted draft payable at a bank, to the bank; or (b) To accept a draft made to the drawee." Fla. Stat. ch. 673.5011(1). In other words, presentment is a term of art that connotes delivery for the specific purpose of payment.

[6] The "midnight deadline rule" provides:

(1) If an item is presented to and received by a payor bank, the bank is accountable for the amount of: (a) A demand item, other than a documentary

9

only to (1) payor banks (2) that are presented checks for payment. It does not apply to collecting banks.[7] In other words, inasmuch as an item is sent to a bank for collection and not presented for payment, the bank receiving the check for collection is not a payor bank, but a collecting bank, and therefore, the midnight deadline is not applicable.

SCADIF argues that the plain language of the Check, which unambiguously designates First Union as the drawee,[8] combined with the plain language of Article 4, which defines "payor bank" as the "bank that is the drawee of the draft," see supra n.4, and "collecting bank" as any bank handling a check for collection "except the payor bank," see supra n.7, necessarily suggests that First Union is the payor bank and therefore subject to the midnight deadline rule. We disagree, as

draft, whether properly payable or not, if the bank, in any case in which it is not also a depositary bank, retains the item beyond midnight of the banking day of receipt without settling for it or, whether or not it is also the depositary bank, does not pay or return the item or send notice of dishonor until after its midnight deadline.

Fla. Stat. ch. 674.302. In other words, a payor bank that is presented a check for payment must return the check before midnight of the following banking day in order to revoke settlement. Otherwise, the payor bank is liable for the amount of the check. "Payor bank" is defined infra, at n.4.

[7] "Collecting bank" is defined by UCC Article 4 as "a bank handling an item for collection except the payor bank." Fla. Stat. ch. 674.105(5).

[8] "Drawee" is defined as "a person ordered in a draft to make payment." Fla. Stat. ch. 673.1031(1)(b).

10

this analysis fails to consider that UCC provisions may be varied by agreement of the parties.

The Florida UCC provides that parties may vary provisions of the UCC by agreement. See Fla. Stat. ch. 671.102(3) (providing that "[t]he effect of provisions of this code may be varied by agreement"); see also, e.g., Miller v. Econ. Lab., Inc., 410 So.2d 642, 642 (Fla. Dist. Ct. App. 1982). Therefore, if SCADIF and First Union agreed that Banque Francaise, SCADIF's agent,[9] sent the Check to First Union for First Union to pay if and when there were sufficient funds in Ameriplex's account to cover the Check, then First Union was acting as a collecting bank and therefore not subject to the midnight deadline rule. We must decide if the parties did so agree.

**B.**

"Agreement" is defined by the UCC as "the bargain of the parties in fact as found in their language or by implication from other circumstances including course of dealing or usage of trade or course of performance as provided in this code." Fla. Stat. ch. 671.201(3). Therefore, we may consider course of dealing, usage of trade, and course of performance in determining whether the parties made

---

[9] Under UCC Article 4, as adopted in Florida, a collecting bank is an agent for its customer. Fla. Stat. ch. 674.201(1). Therefore, with regard to all of Banque Francaise's actions with respect to the Check, Banque Francaise was acting as an agent for SCADIF.

11

an agreement to vary the provisions of the UCC.

There was testimony at trial that when a check and a collection letter are transmitted together, they are readily recognized in the banking industry as an item known as a "clean check collection." Because it is a collection item, the bank to whom it is sent is a collecting bank and therefore not subject to the midnight deadline rule, as this rule is limited by its own terms to payor banks. See Fla. Stat. ch. 674.302. This evidence of usage of trade was properly considered by the district court in determining that the parties reached an agreement that the Check was being sent for collection.

SCADIF argues that if such evidence of usage of trade is permitted to vary the provisions of the UCC, the result is that (1) no matter what a collection letter says, a check will never be subject to the midnight deadline rule if presented by a foreign bank, and (2) no foreign bank can ever present a check as a demand item by mail directly to a payor bank because the direct presentment of the check would change the nature of the check and constitute a "clean check collection." These assertions are erroneous, as SCADIF is suggesting that the method of presentment is determinative to the classification of the item.

Only if the parties reach an agreement that the check is being sent for collection does the demand item become a "clean check collection" item. Merely

12

because (1) the party presenting the check is foreign, or (2) the party directly presents the check, it does not follow that an agreement for a "clean check collection" automatically results. An agreement is required to vary the terms of the UCC; therefore, whether the parties reached an agreement is determinative to whether the item was presented for collection, not the nature of the presentment.

Contrary to SCADIF's allegation, it was not a check alone whose "nature" was changed; this was the Check plus the Collection Letter, and the Collection Letter was based on a telephone conversation between Banque Francaise and First Union. These actions, combined with the usage of trade, support our conclusion that the Check was sent to First Union for collection, based on an agreement of the parties.

Further, binding precedent in this circuit[10] holds that the midnight deadline rule does not apply to demand items sent to or left with a bank for collection. See Western Air & Refrigeration, Inc. v. Metro Bank of Dallas, 599 F.2d 83 (5th Cir. 1979). Although the checks at issue in Western Air were dishonored as demand items first and then became collection items, id. at 86, there is no reason why an item initially submitted for collection should be treated differently under Article 4

---

[10] The Eleventh Circuit is bound by cases decided by the Fifth Circuit prior to the creation of the Eleventh Circuit. Bonner v. City of Pritchard, Ala., 661 F.2d 1206, 1207 (11th Cir. 1981).

13

than one initially presented for payment.

The midnight deadline rule is not applicable because the parties agreed that the Check at issue was sent to First Union as a collection item and not presented for payment. Therefore, the district court properly entered judgment for First Union.

**III.**

Next, we review whether the district court erred in denying SCADIF's motion for sanctions against First Union. SCADIF argues, inter alia, that First Union (1) concealed highly relevant documents, and (2) conspired with witness Professor Barkley Clark in his amending his treatise during the pendency of this trial to add a section providing specific factors a court should consider in determining whether an item is sent for collection. We review a district court's decision whether to impose sanctions for abuse of discretion. Barnes v. Dalton, 158 F.3d 1212, 1214 (11th Cir. 1998) (citation omitted).

First, there is no dispute that First Union failed to timely produce certain documents during the course of trial. The district court found these failures to timely produce documents "a serious procedural and ethical violation, and one that cannot be dismissed lightly," and it included a written reprimand in its published decision. SCADIF v. First Union Nat. Bank, 208 F.Supp.2d 1352, 1379 (S.D. Fla.

14

2002). However, it also found that the relevant documents were of minimal relevance. Id. SCADIF has presented no evidence on appeal that suggests that these findings and conclusions were an abuse of discretion.

With regard to Professor Clark's amendments to his treatise during the pendency of this case, the district court found that although the amendments may have created an appearance of impropriety, there was "no actual prejudice" because: (1) the court did not rely on the treatise; (2) First Union never attempted to persuade the court to rely on the treatise; (3) First Union never entered the treatise into evidence; and (4) the court was aware of the amendments. Id. at 1380. Further, the district court pointed out that SCADIF "extensively examined" Professor Clark, giving the court an opportunity to evaluate his credibility. Id. SCADIF has presented no evidence to show that the district court abused its discretion in refusing to impose monetary sanctions for Professor Clark's actions. Therefore, we affirm the district court's motion denying sanctions.

## IV.

For the aforementioned reasons, we affirm.

AFFIRMED.