CORSICA LIVESTOCK SALES, INC., a
Corp., Appellant,

v.

The SUMITOMO BANK OF
CALIFORNIA, Appellee.

FIRST MITCHELL NATIONAL
BANK, Appellant,

v.

The SUMITOMO BANK OF
CALIFORNIA, Appellee.

No. 82–1553.

United States Court of Appeals,
Eighth Circuit.

Submitted March 18, 1983.

Decided Dec. 30, 1983.

As Modified on Denial of Rehearing
Jan. 17, 1984.

Gale Fisher, P.C., Sioux Falls, S.D., for appellants Corsica Livestock Sales, Inc. and First Mitchell Nat. Bank.

David B. Flinn, Leland, Parachini, Steinberg, Flinn, Matzger & Melnick, San Francisco, Cal., David V. Vrooman, Sioux Falls, S.D., for appellee.

Before HEANEY, ROSS and FAGG, Circuit Judges.

ROSS, Circuit Judge.

Corsica Livestock Sales, Inc. (Corsica Sales) and First Mitchell National Bank (Mitchell Bank) brought a diversity action to recover $307,648.02 from the Sumitomo Bank of California (Sumitomo) based upon the alleged mishandling of two checks which were presented to Sumitomo for payment. The jury returned a verdict in favor of the defendant, Sumitomo, and a judgment dismissing the action on the merits was entered in United States District Court for the District of South Dakota, Southern Division, the Honorable John B. Jones presiding. Corsica and Mitchell Bank seek a reversal of the judgment entered on the jury verdict and request that this court order a new trial because the district court erred in: (1) denying plaintiffs' motion to amend the complaint to conform to the proof on a breach of contract theory and then refusing to so instruct the jury; (2) refusing to instruct the jury on the Uniform Commercial Code definition of "unauthorized signature"; and (3) giving a supplemental instruction in response to a jury inquiry. For the reasons set forth herein, we affirm in part and reverse in part.

The salient facts, as they relate to this appeal, are not in dispute. Corsica Sales is a South Dakota corporation which operates a sale barn facility where livestock is consigned by sellers for sale and the sale barn receives a commission. Buyers at the sale barn pay for the livestock with checks which are deposited by Corsica Sales into a custodial account at Mitchell Bank. Corsica Livestock Marketing, Inc. (Corsica Marketing) is a separate and unrelated corporation engaged in buying and selling livestock on its own account, purchasing livestock at one price and hoping to sell them at a higher price, thus earning a profit on the transaction. The principal stockholders of Corsica Marketing were Dale Dockendorf and Dale Borman. In early 1979, Corsica Marketing was seeking investors too infuse capital into the corporation. During this search for investors, Elwood "Woody" Nelson, a Sioux Falls insurance man, showed an interest in investing in Corsica Marketing. Nelson and George Etter were the principal stockholders of General Services Corporation (GSC), a Nevada corporation. In exchange for cash and stock of Corsica Marketing, Nelson and Etter promised to procure a line of credit for Corsica Marketing.

In March of 1979, Nelson and Etter opened a corporate checking account with the Sumitomo Bank of California. The account was opened in the name of GSC with an initial deposit of $57,000. Nelson and Etter signed signature cards on the account at this time. Nelson and Etter explained to representatives of Sumitomo that they would be making large purchases of cattle in South Dakota and inquired about the possibility of obtaining a $1,500,-000 line of credit to aid in these purchases. In response to this inquiry Sumitomo's representatives initiated an investigation of GSC's proposed activities. On March 28, 1979, Thomas Reding, an officer of Sumitomo, traveled to South Dakota to personally investigate the method of operation at the Corsica sale barn. While in South Dakota, Reding visited the sale barn and talked to various officers and stockholders of Corsica Marketing and GSC. Reding learned that Corsica Marketing would be purchasing cattle at the sale barn with funds provided by GSC. As soon as these cattle were resold, the proceeds were to be deposited in and wired through the Hurley State Bank in South Dakota to Sumitomo for credit to the GSC account. Ron Wentland, an employee of Corsica Marketing, was to handle these

monetary transactions. To this end, Nelson and Etter had Wentland execute one of Sumitomo's signature cards as an authorized drawer on the GSC account. It appears, however, that this signature card was never given to the Sumitomo Bank. After Reding's return, Sumitomo denied GSC's request for a line of credit. Nelson and Etter never informed Corsica Marketing that the line of credit was not in force. GSC continued to maintain the account at Sumitomo and several drafts, in payment of South Dakota livestock purchases, were honored by Sumitomo. Two of these checks were signed by Wentland and Sumitomo mistakenly paid them even though no signature card existed in the file.

On April 4, 1979, Corsica Marketing purchased some livestock and Wentland wrote a check to Corsica Sales in the amount of $287,631.22. This check was deposited in the custodial account at the Mitchell Bank, however, the check was returned by the drawee, Hurley State Bank, because of insufficient funds. Glen Gedstad, an officer of Mitchell Bank, called Wentland on April 10, and told him the check was being returned, and that he should come in and make a deposit. Nelson told Wentland to issue a new check on the GSC account in the Sumitomo Bank and Wentland did as he was instructed. Wentland also gave Mitchell Bank a check payable to Corsica Sales in the amount of $117,379.04, drawn on the GSC account at the Sumitomo Bank. Gedstad prepared these two checks for collection and sent them directly to the Sumitomo Bank as collection items, with instructions to "Pay at Sight." On April 17, 1979, Brad Wetherell, president of Sumitomo Bank, called Herman Lerdal, president of Mitchell Bank, and told him that Sumitomo had received the checks but there were insufficient funds with which to pay the checks. Wetherell further told Lerdal that Etter had advised Sumitomo that there was a wire transfer coming in and Wetherell asked Lerdal if he should hold the checks for another day. Lerdal told Wetherell to hold the checks for another day to see if the wire would come in and facilitate payment. On April 18, 1979, Wentland and Docken-

dorf called the Sumitomo Bank to inquire about the GSC account. Wetherell told Wentland and Dockendorf that Nelson and Etter were coming into the bank that morning to close the account and take the money out of the bank. Dockendorf told Wetherell that he should not let the money leave the bank and that there was something "crooked" going on.

The wire transfer in the sum of $300,000 was received by Sumitomo on April 17, and credited to the account on April 18, bringing the account balance to $307,648.02. On the morning of April 18, when Nelson and Etter came in the bank to close out the GSC account, Wetherell asked them to cosign the two checks which had previously been paid without a signature card from Wentland. Nelson and Etter complied with the request. Wetherell then asked Nelson and Etter about paying the two outstanding checks sent by the Mitchell Bank. Nelson and Etter told Wetherell they would not cosign those checks and that they only wished to close out their account. Wetherell then wrote out a cashier's check payable to GSC in the amount of $307,648.02 to close the account and handed the check to Nelson. Sumitomo then sent the two checks back to Mitchell Bank with the notation "signature not authorized."

Appellants contend that the district court erred in denying their motion to amend the complaint to conform to the proof pursuant to Rule 15(b) of the Federal Rules of Civil Procedure on a breach of contract theory. Appellants also allege that the subsequent refusal to instruct on this particular theory of liability was reversible error. We agree and accordingly reverse and remand for a new trial.

Appellants submit that when Sumitomo Bank agreed to hold the checks in anticipation of an impending wire transfer they then entered into a contract to pay those checks if and when the funds arrived. Because the funds did come in and the checks were returned unpaid, appellants contend that the bank is liable for breach of contract. Sumitomo submits that recovery could not be based upon breach of contract

because of a failure of consideration. We disagree. We feel that the evidence gleaned from the record may support a finding of consideration, i.e., Sumitomo was relieved of its obligation to act within the parameters of the "midnight deadline" rule if the checks would be paid upon receipt of the funds arriving by wire transfer.

Appellants had alleged in the complaint that Sumitomo was liable for violating the "midnight deadline" rule when it held the checks until April 18, 1979. Section 4–302 of the Uniform Commercial Code provides that if an item is presented to a payor bank, the payor bank becomes accountable for the amount of the item if it does not pay or retains the item until after its "midnight deadline" which is midnight of the next banking day. However, an exception to the "midnight deadline" rule exists where an agreement is reached between the bank and the payee that the bank should retain the check. *Western Air & Refrigeration, Inc. v. Metro Bank of Dallas,* 599 F.2d 83, 89 (5th Cir.1979). In reliance on these principles the district court dismissed plaintiffs' claim based on the "midnight deadline" rule because the evidence showed that Mitchell Bank had instructed Sumitomo Bank to retain the checks for payment if the wire transfer arrived from South Dakota. Appellants then moved to amend the complaint to conform to the proof because the dismissal of the "midnight deadline" claim was based upon evidence which would support a contract theory of recovery, i.e., the agreement reached between the Sumitomo and Mitchell banks on retention of the checks. The district court denied the motion to amend and also refused to instruct the jury on a contract theory of recovery.

Generally, Rule 15 of the Federal Rules of Civil Procedure contemplates that amendments to pleadings should be allowed with liberality where necessary to bring about the furtherance of justice and where the adverse party will not be prejudiced, it is a settled rule of practice that the trial court will only be reversed on appeal if it abused its discretion in granting or refusing

an amendment to the pleadings. *Gallon v. Lloyd-Thomas Co.,* 264 F.2d 821, 823 (8th Cir.1959). But because of the clear command of Rule 15(b), we find that the court did abuse its discretion and that it should have allowed appellants to amend their pleadings to conform to the evidence presented at trial.

Rule 15(b) mandates that

[w]hen issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment * * *.

Thus, if appellants' issue of breach of contract was tried by express or implied consent, the district court should have considered it raised by the pleadings and should have allowed amendment upon appellants' request. The question is whether the issue of breach of contract was so tried. It is obvious that the parties did not expressly consent to try this issue. They did, however, impliedly consent to do so: the testimony during trial established that an agreement existed which negated the "midnight deadline" rule and Sumitomo, in its answer, even admitted that it had an agreement with Mitchell Bank to hold the checks for payment. Thus, the fact that an agreement existed is not seriously in dispute. It is the substance of that agreement which is in dispute and should have gone to the jury. Moreover, we can find implied consent when a party fails to object to evidence relating to issues which are beyond the pleadings. *Nielson v. Armstrong Rubber Co.,* 570 F.2d 272, 275 (8th Cir.1978). In this case, all the testimony on the agreement between Mr. Lerdal and Mr. Wetherell was admitted without objection. An excerpt of Mr. Wetherell's testimony, which shows evidence clearly relating to a breach of contract theory, is as follows:

Q  Well, you, nevertheless, made a telephone call on the 17th to Mr. Herman Lerdal at the bank, didn't you?

A  I made a phone call to Mr. Lerdal, telling him that we had received the checks, based upon my operations officer telling me that fact and I also told him Etter informed me a wire was coming in. We did not have funds to cover the checks.  Then he told me to please keep them for payment the following day and I said that I would and that I would call him on the 18th.

Q  George Etter told you on the 17th that there was between three hundred to five hundred thousand dollars being wired in?

A  Yes, he did.

Q  And that when that money got there, then there would be enough to pay these checks?

A  Enough to pay those checks, if they authorized the payment, yes.

Q  Well, how did Mr. Etter know how much these checks were without looking at them?

A  He did not look at them.  I told him we had checks in for collection in the approximate amount and he said, fine, a wire would be coming in and that's what caused me to lead—to tell Mr. Lerdal that the wire was coming in and that they would be paid on the 18th.

Q  Okay.  You told Mr. Lerdal that these checks would be paid on the 18th?

A  Yes.

Q  That is what you recall?

A  Yes, based upon Etter's statements, yes, and based upon the wire coming in.

Q  All right.  Now you didn't do that on the 18th, did you?

A  No, I did not, because the—

Q  Did Woody Nelson and George Etter come into your bank on the 18th?

A  Both Nelson and Etter were in my bank on the 18th.

Q  And Woody Nelson wrote out a check for $307,000 to close the account, isn't that right?

A  Yes.

We feel that this testimony unequivocally brought the new theory into the case with the implied consent of all parties.  Thus, it was an abuse of discretion for the district court to deny the motion to amend the pleadings to conform to the proof.

■ Appellants also contend that the court erred in refusing their requested instructions 11 and 12 on the breach of contract issue.  We agree.  Each party is entitled to have the jury instructed on its theory of the case if there is any competent evidence in support of such theory and the instruction is properly requested; refusal to so instruct the jury is reversible error. *Bartak v. Bell-Gaylardt & Wells, Inc.*, 629 F.2d 523 (8th Cir.1980).  Because we have already found that there was competent evidence on the contract theory of liability, we find that the refusal to instruct on that issue was reversible error.

Since this case must be reversed and remanded for a new trial, ordinarily we would not have to reach the appellants' other allegations of error.  But in the interest of avoiding possible future appeals, we will briefly discuss the only allegation of error likely to recur at the new trial.[1]

Appellants claim that the district court erred in giving instruction 13 which reads as follows:

If a bank upon which a check is drawn discovers, before paying it, that it bears an unauthorized signature, that is justification for not paying the item.

Appellants object to this instruction because it omitted a definition of "unauthorized signature" and appellants offered a proposed instruction which defined "unauthorized signature."  Appellants assert that Section 1–201(43) of the Uniform Commercial Code properly defines an "unauthorized signature" as one made without actual, implied or apparent authority.  In short, appellants assert that Wentland's signature was an authorized signature because Nelson and Etter empowered him to sign checks even though the bank did not have a signature card on record.  We do not

---

1.  We will not address the issue on giving a supplemental instruction in response to a jury inquiry as we feel that this probably will not arise at the new trial.

feel that appellants' position is a correct statement of the law applicable to this case. The Uniform Commercial Code, § 4–103(1) provides that:

> The effect of the provisions of this chapter may be varied by agreement except that no agreement can disclaim a bank's responsibility for its own lack of good faith or failure to exercise ordinary care or can limit the measure of damages for such lack or failure; but the parties may by agreement determine the standards by which such responsibility is to be measured if such standards are not manifestly unreasonable.

We feel in this case the bank had an agreement with Nelson and Etter that the only checks which would be paid were those for which the bank had a signature card on file. To require otherwise would put an onerous burden on the bank. Thus, it would be improper to define "unauthorized signature" on an agency basis instead of a contract basis.

For the foregoing reasons we reverse and remand to the district court for a new trial on the sole issue of whether or not there was a breach of contract. The trial court shall permit appellants to amend their complaint to allege their contract theory pursuant to Rule 15(b).

FAGG, Circuit Judge, dissenting.

In my view the trial court did not commit reversible error. First, the trial court did not commit error in denying appellants' motion to amend their complaints to conform to the proof on a breach of contract theory. This theory was not pled in their complaints nor was it tried by express or implied consent of the parties. Testimony which would support a breach of contract theory came in at a time when the midnight deadline claim was still in the case as a pled issue. Thus, because this evidence was relevant to the question whether the midnight deadline rule was violated, lack of objection by defense counsel to its introduction does not indicate that the issue of breach of contract was tried by consent.

The record shows that at the time the district court dismissed the midnight dead- line claim appellants' counsel was aware that his clients may have had an alternative claim based on breach of contract, and counsel suggested that he might seek to amend his pleadings to conform to the proof in order to assert a contract claim. However, a motion to amend was not made at that time. Hence, when Sumitomo proceeded to present its evidence the issue of a violation of the midnight deadline rule had been removed from the case, but a breach of contract issue had not been added. Under these circumstances, Sumitomo had no reason to present evidence concerning a contract theory. Because the contract theory had not been tried by consent, the district court committed no error in denying the motion to amend the complaints at the close of evidence and accordingly refusing to give jury instructions which pertained to a contract theory.

Second, as a matter of law the facts of this case do not sustain the majority's determination that the record could support a finding of consideration for Sumitomo's alleged promise to pay the checks conditioned only on adequate funds being deposited. *Ante,* p. 377. When it agreed to hold the checks for another day Sumitomo was not seeking relief from the midnight deadline rule. Instead, the president of the Mitchell Bank instructed Sumitomo to disregard the midnight deadline rule and hold the checks until the next banking day based upon an outside chance that covering funds would then be available and the checks would be paid. Otherwise, it is unquestioned that Sumitomo was prepared to return the insufficient funds checks to the Mitchell Bank on April 17. Thus Sumitomo had no reason or desire to be "relieved of its obligation to act within the parameters of the 'midnight deadline' rule." *Ante,* p. 377.

Furthermore, given Sumitomo's role as a drawee bank, the agreement between the bank presidents that Sumitomo would pay the insufficient funds checks, conditioned on the availability of funds, carried with it by implication the condition that the checks bore authorized signatures. It is established by the record that Wentland's signature did not appear as an authorized signa-

ture on the signature card held by Sumitomo pertaining to the GSC account, and that Sumitomo's depositors, Nelson and Etter, refused to authorize payment of the two outstanding checks signed by Wentland. The district court's jury instruction 13, approved by the majority, states that a bank is justified in not paying an item that bears an unauthorized signature. Under these circumstances, therefore, Sumitomo was well within its rights when it complied with its depositors' demand to close their account on April 18 without paying checks bearing unauthorized signatures, and it did not breach any agreement it had with the Mitchell Bank in so doing. Hence, even if it could be said that the trial court committed error in denying appellants' motion to amend their complaints to assert a contract theory, logically it would have been futile to grant the motion, since the bank in any event was justified in refusing to pay checks bearing a signature not found on the signature card it held.

I would affirm.